[L.A. No. 32002. Dec. 31, 1985.]

MICHAEL LYBARGER, Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

**COUNSEL**

Loew & Marr, Robert J. Loew, Cecil W. Marr and Mary Ann Healy for Plaintiff and Appellant.

Ira Reiner, City Attorney, Frederick N. Merkin, Senior Assistant City Attorney, Leslie E. Brown and Linda K. Lefkowitz, Deputy City Attorneys, for Defendant and Respondent.

## OPINION

LUCAS, J.—In this case, we construe various provisions of the Public Safety Officers Procedural Bill of Rights Act (the act) (Gov. Code, § 3300 et seq.; further statutory references are to this code unless otherwise indicated). Among other issues, we consider whether appellant police officer was properly advised of his constitutional rights prior to an administrative investigation into possible criminal misconduct, and whether he was properly disciplined for failing to cooperate with the investigators. We have concluded that, although an officer who refuses to cooperate in an investigation of this kind may be *administratively* disciplined, the discipline in the present case must be set aside because appellant was never advised that any statements he made could not be used against him in a subsequent *criminal* proceeding. Had appellant been properly so advised, he might well have elected to cooperate with his employer, thereby avoiding imposition of discipline based on his insubordination. Accordingly, we will order the administrative decision imposing such discipline annulled.

Michael Lybarger appeals from a judgment denying his peremptory writ of mandate. (Code Civ. Proc., § 1094.5.) Appellant was a police officer with the 77th Street Vice Unit of the Los Angeles Police Department. On March 26, 1980, he reported to work and was informed by an officer from the internal affairs division about a major investigation involving his unit. Appellant and two other officers were transported to Parker Center for interrogation; appellant was the last of the three to be interviewed. His union provided him with an attorney for this interview and, at its commencement, appellant was informed of the allegations being investigated, including charges of false arrest, false imprisonment, falsification of records, acceptance of a bribe and conspiracy to commit these offenses. In response to his attorney's questions, the interrogating officers confirmed that a criminal investigation was pending, and that if appellant refused to cooperate in this administrative interview, he could be charged with insubordination and could lose his job. Appellant was then ordered to cooperate in the investigation. After conferring privately with his attorney, he stated that he did not want to say anything and that he would not cooperate, even though his refusal would result in a charge of insubordination.

Appellant was charged with one count of insubordination, and an administrative board hearing was had on this charge. Appellant entered a plea of

guilty with an explanation, presenting the mitigating defense that although he was disobedient to the department, he was not being rebellious, but rather acted on poor advice of his attorney at the investigation. Appellant testified at the hearing that his attorney had advised him in private that the department did not have anything "on him," that if he talked he could be giving the department information that they could use, and that "if I were you, I wouldn't say a damn thing." Appellant further stated that his disobedience to the order to cooperate in the investigation was based on this advice.

The board found appellant guilty of the charge of insubordination, basing its finding on his plea, the testimony of the interrogators, and the tape recording of the investigative interview. After deliberation regarding the penalty, the board recommended appellant be removed from his position with total loss of pay. This recommendation was adopted by the police chief. Appellant filed a petition in superior court for peremptory writ of mandate ordering respondents to set aside the administrative decision removing him from his position as a police officer. He alleged that his rights under the act were violated in various respects. The trial court applied the independent judgment test and found that appellant was interrogated properly, in a proper manner at a proper time, and that the administrative findings were adequately supported. The court saw no deprivation of appellant's due process rights and found the penalty of removal justified by appellant's refusal to testify which, under the circumstances, harmed the public service. The petition was denied, and judgment was entered accordingly.

Among other contentions, appellant makes two related arguments regarding his rights under the act. First, he asserts that by reason of section 3304, subdivision (a), he cannot be administratively disciplined for exercising his constitutional right to remain silent at the investigative hearing. Second, assuming arguendo that he had no absolute right to remain silent free of administrative discipline or penalty, he argues that by reason of section 3303, subdivision (g), he should have been advised that any statements he chose to make under the compulsion or threat of such discipline could not be used against him in any subsequent criminal proceeding. As will appear following a review of the pertinent provisions of the act, we have concluded that appellant's second contention has merit.

1. *The Act*

The act's declared purpose was to maintain stable employer-employee relations and thereby assure effective law enforcement. (§ 3301.) Any investigation of a public safety officer which might lead to punitive action must take place under certain specified conditions. (§ 3303.) These conditions include conducting the interrogation at a reasonable hour (*id.,* subd.

(a)), limiting the interrogation to two interrogators (subd. (b)), informing the officer in advance of the nature of the investigation (subd. (c)), and limiting the duration of the interrogation to a reasonable period (subd. (d)). In addition, section 3303, subdivision (e), provides in pertinent part that "The public safety officer under interrogation shall not be threatened with punitive action, *except that an officer refusing to respond to questions or submit to interrogations shall be informed that failure to answer questions directly related to the investigation or interrogation may result in punitive action.*" (Italics added.)

Section 3303, subdivision (g), provides that "If prior to or during the interrogation . . . it is deemed that he [the officer] may be charged with a criminal offense, he shall immediately be informed of his constitutional rights."

Finally, section 3304, subdivision (a), provides in pertinent part that "No public safety officer shall be subjected to punitive action . . . because of the lawful exercise of the rights granted under this chapter [which includes section 3303], or the exercise of any existing administrative grievance procedure."

## 2. *Duty to Cooperate*

 Appellant argues that section 3304, subdivision (a), insulated him from administrative discipline imposed solely by reason of his exercise of the right to remain silent. But appellant had neither a constitutional nor a statutory right to remain silent *free of administrative sanction.* As a matter of constitutional law, it is well established that a public employee has no absolute right to refuse to answer potentially incriminating questions posed by his employer. Instead, his self-incrimination rights are deemed adequately protected by precluding any use of his statements at a subsequent criminal proceeding. (See *Lefkowitz* v. *Turley* (1973) 414 U.S. 70, 77-79 [38 L.Ed.2d 274, 281, 283, 94 S.Ct. 316]; *Garrity* v. *New Jersey* (1967) 385 U.S. 493, 500 [17 L.Ed.2d 562, 567, 87 S.Ct. 616].)

 Similarly, appellant had no statutory right to remain silent. Section 3303, subdivision (e), expressly provides that an officer who refuses to respond to questions or submit to interrogation is subject to punitive action by his employer. Moreover, contrary to appellant's analysis, subdivision (a) of section 3304 does not protect the officer from punitive action based on his refusal to cooperate in an investigation, since such refusal is not one of the "rights granted under" the act. (Cf. § 3307, expressly creating an exemption from *any* disciplinary action for refusal to take a polygraph test.)

In response to the observation that section 3303, subdivision (e), *expressly* allows punitive action for a refusal to respond to questions directly related to the investigation, it is argued that the foregoing provision merely deals with the general or ordinary case while the protection afforded by subdivision (g) (advice regarding "constitutional rights") applies to the specific or particular case of a public safety officer under the threat of criminal prosecution. But this strained interpretation would result in an intolerable anomaly: The petty infractor who fails to respond to questioning could be subject to punitive action while the criminal offender could refuse to cooperate with absolute impunity.

We must construe the act in such a manner as to encourage full cooperation with police department investigations of criminal offenses, so long as fundamental constitutional rights are protected in the process. Such a balancing of interests is achieved by holding that, although the officer under investigation is not compelled to respond to potentially incriminating questions, and his refusal to speak cannot be used against him *in a criminal proceeding,* nevertheless such refusal may be deemed insubordination leading to punitive action by his employer. Seen in this light, the right to remain silent is not a "hollow" right: It may be exercised without fear of *penal* sanction.

Moreover, our interpretation of the act does not render subdivision (g) of section 3303 superfluous, for that provision indeed confers *additional* protection on police officers, requiring that they be immediately advised of their constitutional rights in a noncustodial, administrative setting. Prior to the act, of course, no such advice or admonition was required by law. (See *Beckwith* v. *United States* (1976) 425 U.S. 341, 345-347 [48 L.Ed.2d 1, 7, 96 S.Ct. 1612]; *People* v. *White* (1968) 69 Cal.2d 751, 760-761 [72 Cal.Rptr. 873, 446 P.2d 993].)

3. *Failure to Advise Regarding Constitutional Rights*

As noted previously, the act provides that an interrogated officer must be "immediately informed of his constitutional rights" once it is "deemed" that he may be charged with a criminal offense. (§ 3303, subd. (g).) In the present case, apart from being told that his refusal to cooperate would result in administrative discipline, defendant was not informed regarding the extent of his "constitutional rights."

■ Before considering what rights are contemplated by the foregoing provision, we must determine whether or not it was "deemed" within the meaning of section 3303, subdivision (g), that appellant might be charged with a criminal offense at the time the interrogation commenced. (See

§ 3303, subd. (g).) The record contains no conclusive evidence of the officers' subjective views regarding the matter. Yet, as previously indicated, a criminal investigation was indeed pending regarding various specified acts of misconduct by officers of the 77th Street vice unit to which appellant was assigned. The interrogation was conducted in the presence of *five* investigating officers, suggesting that the department had indeed focused on appellant as a likely suspect. (As noted above, the act provides that questions should be asked by no more than *two* interrogators.) Finally, prior to the time when appellant elected to remain silent, his attorney summarized the various "allegations" for his client, stating that "they're charging you" with "five specific felonies," including false arrest, false imprisonment, falsification of records, accepting a bribe and conspiracy. None of the investigating officers corrected counsel's characterization of the proceeding as one brought for the purpose of investigating criminal "charges" against appellant.[1] Under these circumstances, it is reasonable to conclude that appellant was "deemed" a criminal suspect, thereby triggering the statutory requirement that he be "immediately informed of his constitutional rights." (*Ibid.*)

What were appellant's "constitutional rights"? ■ Given the context of an administrative inquiry into possible criminal misconduct, we think it likely the Legislature intended that interrogated officers be advised of their so-called "*Miranda* rights"[2] (see *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), as modified by the *Lefkowitz/Garrity* rule previously discussed. In other words, appellant should have been told, among other things, that although he had the right to remain silent and not incriminate himself, (1) his silence could be deemed insubordination, leading to administrative discipline, and (2) any statement made under the compulsion of the threat of such discipline could not be used against him in any subsequent criminal proceeding. (See *Lefkowitz* v. *Turley, supra,* 414 U.S. 70, 77-79 [38 L.Ed.2d 274, 281-283]; *Garrity* v. *New Jersey, supra,* 385 U.S. 493, 500 [17 L.Ed.2d 562, 567].) ■ Although appellant was properly advised of the adverse effect of his silence, he was never told of the extent of the protection afforded to any statements he might make. That omission was critically important here.

It is argued that, because appellant refused to answer any questions, he was not harmed by the failure to advise him of his rights. Yet had appellant

---

[1] We do not mean to suggest that the trigger for advisement under the statutes is dependent only upon the subjective understanding of the interrogating officers. We read section 3303, subdivision (g) to require the investigating officers to inform the officer being questioned of his constitutional rights whenever he refuses to answer on self-incrimination grounds.

[2] These rights include the right to remain silent, the right to the presence and assistance of counsel, and the admonition that any statements may be used against the declarant in a court of law. (See *People* v. *Pettingill* (1978) 21 Cal.3d 231, 235, fn. 2 [145 Cal.Rptr. 861, 578 P.2d 108].)

understood that his statements during the administrative interview could not be used against him in a criminal proceeding, he might well have elected to cooperate rather than remain silent. Although respondents suggest that appellant must have known his "constitutional rights," being a police officer accustomed to admonishing suspects, and being represented by counsel at the administrative hearing, for the following reasons we cannot so readily make such a presumption on this record.

First, the act specifically requires that *all* police officers, despite their supposed experience in law enforcement, be advised of their constitutional rights if possible criminal charges are contemplated, thus indicating a legislative judgment that some officers may be unaware of those rights.

Second, appellant's counsel appears to have advised his client to remain silent because of the possibility appellant might incriminate himself in a criminal charge. When the subject first arose, and one of the officers confirmed that a potential criminal investigation was involved, counsel at once replied: "At this time . . . we decline to answer any questions in regard to the criminal investigation." Appellant himself, as a police officer, undoubtedly was familiar with the general admonition that anything he said would be used against him. Thus, it appears that both appellant and his counsel may have failed to appreciate that, if appellant were compelled to testify under the threat of administrative discipline, his testimony could not be subsequently used to incriminate him in criminal proceedings. (*Lefkowitz, supra,* 414 U.S. at pp. 77-79 [38 L.Ed.2d at pp. 281-282].)

We conclude that the trial court erred in denying a peremptory writ of mandate to annul the administrative decision terminating appellant's employment. Accordingly, we need not reach appellant's alternative contentions.[3]

The judgment is reversed and the cause remanded to the trial court for further proceedings consistent with this opinion.

Mosk, J., Broussard, J., Reynoso, J., Grodin, J., and Kaus, J.,* concurred.

**BIRD, C. J.,** Concurring.—I write separately because I believe the issue here is far more fundamental than the mere failure to follow a statutory

---

[3]As to the concerns expressed in Chief Justice Bird's opinion regarding the permissible scope of inquiry, we note this issue has not been raised at any point by appellant and we therefore decline to address it here.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

directive. No citizen working for the government should lose his job because he chooses to exercise a constitutional right and remain silent during questioning. Since Lybarger was not guaranteed that any incriminating statements he might make during questioning could not be used against him in a criminal prosecution, he retained his constitutional prerogative not to speak. (*Kastigar* v. *United States* (1972) 406 U.S. 441 [32 L.Ed.2d 212, 92 S.Ct. 1653]; *Lefkowitz* v. *Turley* (1973) 414 U.S. 70, 78 [38 L.Ed.2d 274, 282, 94 S.Ct. 316]; *Gardner* v. *Broderick* (1968) 392 U.S. 273, 279 [20 L.Ed.2d 1082, 1087, 88 S.Ct. 1913]; see *Garrity* v. *New Jersey* (1967) 385 U.S. 493 [17 L.Ed.2d 562, 87 S.Ct. 616]; cf. *People* v. *Rucker* (1980) 26 Cal.3d 368, 390 [162 Cal.Rptr. 13, 605 P.2d 843] [citing *Kastigar* and *Lefkowitz*].)

The termination of Lybarger's employment for exercising this constitutional right was a clear violation of the self-incrimination privileges of the state and federal Constitutions.[1] (*Gardner* v. *Broderick, supra,* 392 U.S. 273; *Spevack* v. *Klein* (1967) 385 U.S. 511 [17 L.Ed.2d 574, 87 S.Ct. 625]; *Sanitation Men* v. *Sanitation Comm'r.* (1968) 392 U.S. 280 [20 L.Ed.2d 1089, 88 S.Ct. 1917] [discharge of city employees for refusal to sign waivers of immunity before grand jury or for invoking self-incrimination privilege invalidated].) Further, dismissing a public employee for the mere act of remaining silent—without more—undermines the due process clause's basic guarantee against the arbitrary exercise of government power. (See *Slochower* v. *Board of Education* (1956) 350 U.S. 551 [100 L.Ed. 692, 76 S.Ct. 637]; *Bogacki* v. *Board of Supervisors* (1971) 5 Cal.3d 771, 784-807 [97 Cal.Rptr. 657, 489 P.2d 537] (dis. opn. of Tobriner, J.) cert. den. (1972) 405 U.S. 1030 [31 L.Ed.2d 488, 92 S.Ct. 1301].)

I.

The law is clear. Statutes or governmental actions which force public employees to choose between losing their jobs or giving up their constitutional rights cannot be upheld.

In *Spevack* v. *Klein, supra,* 385 U.S. 511, the United States Supreme Court explained that the privilege against self-incrimination is " 'the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence.' [¶]

---

[1] Throughout this opinion, references to the privilege against self-incrimination are intended to refer to the privileges in both the Fifth Amendment and article I, section 15 of the California Constitution. "[T]he protection afforded to individuals in this state by the privilege against self-incrimination in the California Constitution is at least as broad as, and often broader than, that accorded by the federal Constitution[.]" (*People* v. *Rucker, supra,* 26 Cal.3d at p. 390.)

In this context 'penalty' is not restricted to fine or imprisonment. It means . . . the imposition of any sanction which makes the assertion of the Fifth Amendment privilege 'costly.'" (*Spevack* v. *Klein, supra,* 385 U.S. at pp. 514-515 [17 L.Ed.2d at p. 577], quoting *Malloy* v. *Hogan* (1964) 378 U.S. 1, 8 [12 L.Ed.2d 653, 659, 84 S.Ct. 1489].)

Similarly, *Lefkowitz* v. *Turley, supra,* 414 U.S. 70, 71, 83-84 [38 L.Ed.2d 274, 278, 285] held that an architect could not be disqualified from public contracting as a "penalty" for asserting his constitutional self-incrimination privilege when called to answer questions regarding his contracts with the state or any of its subdivisions.

And in *Gardner* v. *Broderick, supra,* 392 U.S. 273, a case strikingly similar to this one, the court held unconstitutional a city charter provision which authorized the discharge of a police officer who had refused to waive immunity from prosecution when he appeared before a grand jury investigating police misconduct. (*Id.,* at pp. 278-279 [20 L.Ed.2d at pp. 1086-1087.].)

Admittedly, the stated goal of the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.,[2] hereinafter the Act)—to assure "effective law enforcement" (§ 3301)—is an important one which is furthered by internal investigations of police misconduct. However, caution must be exercised before constitutional safeguards are relaxed in order to permit more efficient and effective investigatory procedures. The reason is quite simple. Encroachments upon constitutionally protected freedoms in the interest of efficient and effective investigation of police misconduct may seem benign in the context in which they are originally raised. However, once these encroachments are established, they may well be applied in contexts not originally contemplated.

As the United States Supreme Court advised nearly 100 years ago: "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. . . . It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." (*Boyd* v. *United States* (1886) 116 U.S. 616, 635 [29 L.Ed. 746, 752, 6 S.Ct. 524].) Thus it is understandable that while "claims of overriding interests are not unusual in Fifth Amendment litigation[,] they have not

---

[2]Further statutory references are to the Government Code unless otherwise indicated.

fared well." (*Lefkowitz* v. *Turley, supra,* 414 U.S. at p. 78 [38 L.Ed.2d at p. 282].) These principles guide the resolution of the issues in this case.

The Act provides that "an officer refusing to respond to questions or submit to interrogations shall be informed that the failure to answer questions directly related to the investigation or interrogation may result in punitive action." (§ 3303, subd. (e).) Section 3304, subdivision (a) provides that the head of an agency may "order[] a public safety officer to cooperate with other agencies involved in criminal investigations" and that "[i]f an officer fails to comply with such an order, the agency may officially charge him with insubordination." Finally, subdivision (g) of section 3303 requires that the officer be "informed of his constitutional rights" during the course of an interrogation if "it is deemed that he may be charged with a criminal offense."

Significantly, the "it is deemed" language of subdivision (g) is susceptible to an interpretation that *either* an investigating officer *or* the officer being investigated may "deem" that the latter may be charged with a criminal offense. For this reason, the statute requires investigating officers to inform the officer facing questioning of his right to use immunity when either he or they "deem" that he may be "charged with a criminal offense."

Accordingly, subdivision (g) of section 3303 required the investigating officers to inform appellant that he was guaranteed use immunity once "it [was] deemed" by any of the parties that appellant could be charged with a criminal offense. Since no such protection was offered to Officer Lybarger, and since he might not have remained silent and lost his job had he been fully informed of the consequences of speaking, his employment was improperly terminated.

This construction of the statute is also the only one consistent with the self-incrimination privilege. *Gardner* v. *Broderick, supra,* 392 U.S. 279 illustrates this point. In *Gardner,* a city charter provision required police officers to sign a waiver of immunity for answers to questions before a grand jury. The refusal to do so would result in termination of employment. Gardner refused to sign the waiver and his employment was terminated. Under existing law, the signed waiver would probably have been ineffective since it was "coerced" by the threat of dismissal. (See *id.,* at pp. 278-279 [20 L.Ed.2d at p. 1087]; *Garrity* v. *New Jersey, supra,* 385 U.S. at pp. 497-498 [17 L.Ed.2d at pp. 565-566].) However, the officer apparently was not aware of his right to challenge the waiver on that ground.

The *Gardner* court found this fact to be critical. It concluded that "[p]etitioner could not have assumed—*and certainly he was not required to*

*assume*—that he was being asked to do an idle act of no legal effect. In any event, the mandate of the great privilege against self-incrimination does not tolerate the attempt, regardless of its ultimate effectiveness, to coerce a waiver of the immunity it confers on penalty of loss of employment.'' (*Gardner, supra,* 392 U.S. at p. 279 [20 L.Ed.2d at p. 1087], italics added.) The court thus declared the city charter provision invalid and reversed the state court decision denying him reinstatement and backpay.

The logic underlying *Gardner* is that an officer under investigation is not required to speculate as to what his constitutional rights are. If an officer chooses to remain silent upon the reasonable belief that he is faced with the choice of exercising his constitutional rights at the expense of losing his job, the Constitution should not abandon him. As the Supreme Court held in *Garrity* v. *New Jersey, supra,* 385 U.S. at page 497 [17 L.Ed.2d at page 565], ''[t]he option to lose [one's] means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent.''

Consistent with the spirit of *Gardner,* section 3303, subdivision (g) requires the investigating officers to inform the officer being questioned of his right to use immunity whenever he refuses to answer on self-incrimination grounds. An officer should not be required to guess at the extent of his rights. An interpretation allowing *either* party to ''deem'' that self-incrimination is implicated by questioning avoids the constitutional problem raised in *Gardner.*[3]

## II.

There are grave due process problems inherent in any system which permits dismissal of an employee solely because he or she invokes a constitutional privilege. Permitting termination for the mere act of remaining silent creates an open invitation for those in power to abuse an otherwise legitimate investigative mechanism.

Justice Cardozo once wrote that the ''protection of the individual against arbitrary action'' is the very essence of due process. (*Ohio Bell Tel. Co.* v. *Comm'n* (1937) 301 U.S. 292, 302 [81 L.Ed. 1093, 1100, 57 S.Ct. 724].) In the public employment context, this means that the basis for discharge

---

[3]As should be apparent, I do not agree with the majority's assertion that no law apart from the Act itself requires an officer to be advised of his constitutional rights before being faced with the choice of incriminating himself or losing his job. (Maj. opn., *ante,* at p. 828.) Nothing in *Beckwith* v. *United States* (1976) 425 U.S. 341, 345-347 [48 L.Ed.2d 1, 6-8, 96 S.Ct. 1612] or *People* v. *White* (1968) 69 Cal.2d 751, 760-761 [72 Cal.Rptr. 873, 446 P.2d 993], upon which the majority rely, compels their conclusion.

must be rationally related to qualifications for the job. (*Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 234 [82 Cal.Rptr. 175, 461 P.2d 375]; *Slochower* v. *Board of Education, supra,* 350 U.S. at p. 559 [100 L.Ed. at p. 701].) There must be a sufficient "nexus" between the asserted grounds for dismissal and the fitness to carry out the responsibilities of employment. (*Perrine* v. *Municipal Court* (1971) 5 Cal.3d 656, 663 [97 Cal.Rptr. 320, 488 P.2d 648], cert. den. 404 U.S. 1038 [30 L.Ed.2d 729, 92 S.Ct. 710]; *Morrison* v. *State Board of Education, supra,* 1 Cal.3d at p. 234; *Perea* v. *Fales* (1974) 39 Cal.App.3d 939, 942 [114 Cal.Rptr. 808].) It is with these principles in mind that the Act must be analyzed.

The Act permits dismissal for refusal to answer *any* question asked in the course of an investigation or interrogation. (§ 3303, subd. (e).) The statute does not require the investigation or interrogation to be related to conduct while on the job or fitness to carry out official duties. Thus, questioning could conceivably cover such irrelevant subjects as the officer's sexual or off-duty activities or his personal beliefs. Nevertheless, the statute requires the officer to answer all questions that "directly relate" to the investigation or face a charge of insubordination and possible termination. (*Ibid.*) And although the officer is entitled to an administrative appeal if he is discharged (§ 3304, subd. (b)), the issues in that hearing may well be confined, as they are in this case, to whether the officer refused to answer rather than whether the questions asked were related to job performance.

Over the years, the state and federal courts have invoked the due process clause to prevent possible abuses of such far-reaching statutes. Not so long ago, for example, "national security" was thought to justify the practice of refusing employment to or terminating the employment of any person who declined to answer questions or sign oaths concerning his or her affiliation with so-called "subversive" organizations.[4] Many statutes were passed authorizing such practices. (See, e.g., former Ed. Code, § 12604 (enacted 1953), now § 7004.)

Upon closer examination, however, courts began to find that many such practices could not be justified as legitimate concerns about job fitness. In the landmark case of *Slochower* v. *Board of Education, supra,* 350 U.S. 551, for example, a teacher at a New York state college had been dismissed

---

[4]For example, in *Board of Education* v. *Mass* (1956) 47 Cal.2d 494, 498 [304 P.2d 1015], this court stated that "the Communist Party is a continuing conspiracy against our government [and l]oyalty on the part of public employees is essential to orderly and dependable government and is therefore relevant to fitness for such employment[.]" There, the court held a schoolteacher could be dismissed for claiming his Fifth Amendment privilege before the House of Representatives Committee on Un-American Activities, provided he was given a proper administrative hearing upon termination.

solely because he had invoked the Fifth Amendment privilege when questioned by a congressional committee. A state statute provided for the automatic dismissal of any employee who relied on the Fifth Amendment to refuse to answer government inquiries. The high court found the teacher's termination violated due process, reasoning that the statute "operates to discharge every city employee who invokes the Fifth Amendment. In practical effect the questions asked are taken as confessed and made the basis of the discharge. No consideration is given to such factors as the subject matter of the questions, remoteness of the period to which they are directed, or justification for exercise of the privilege. It matters not whether the plea resulted from mistake, inadvertence or legal advice conscientiously given, whether wisely or unwisely. The heavy hand of the statute falls alike on all who exercise their constitutional privilege, the full enjoyment of which every person is entitled to receive." (*Id.*, at p. 558 [100 L.Ed. at p. 700].)

Although a Fifth Amendment right was at issue in *Slochower,* the court explicitly based its decision on due process grounds, finding that the teacher was dismissed because of "events occurring before a federal committee whose inquiry was announced as not directed at 'the property, affairs, or government of the city, or . . . official conduct of city employees,'" and thus bore no rational relationship to his fitness for employment. (350 U.S. at p. 558-559 [100 L.Ed. at pp. 700-701].) The court found that, "[s]ince no inference of guilt was possible from the claim [of privilege] before the federal committee, the discharge falls of its own weight as wholly without support." (*Ibid.*)

This court responded to *Slochower* in *Board of Education* v. *Mass, supra,* 47 Cal.2d 494. There, the court reviewed the constitutionality of this state's anti-subversive statute which permitted the dismissal of any teacher who refused to answer questions before any state or federal legislative committee investigating "un-American activities." (*Id.*, at p. 495, fn. 1.) The court held that in order to avoid an unconstitutional application of the statute it had to be read as requiring a full hearing and a determination that an employee's reasons for invoking the privilege were not sufficient. "Factors of the type mentioned in the Slochower decision . . . should, of course, govern the determination of the sufficiency of the employee's reasons." (*Mass, supra,* 47 Cal.2d at p. 499.)

Outside of the interrogation context, this court has held that a termination cannot be premised on arbitrary factors. Thus, in *Morrison* v. *State Board of Education, supra,* 1 Cal.3d 214, this court held that a schoolteacher could not be discharged for engaging in a noncriminal homosexual relationship with another teacher. Such acts supported no inference of the teacher's unfitness to teach. (*Id.*, at p. 238.) The court ruled that "[n]o person can

be denied government employment because of factors unconnected with the responsibilities of that employment." (*Id.*, at p. 234.)

As noted, subdivision (e) requires an officer either to "respond to questions" regardless of the subject under investigation, or face "punitive action." Since that statute is inconsistent with *Morrison*'s command that reasons for termination be "[]connected with the responsibilities of [] employment," it should be construed to permit sanctions against an officer only when there is a refusal to answer questions designed to elicit statements relating to official duties or fitness to be a police officer.