[No. C003975. Third Dist. Aug. 30, 1989.]

MONROE DYSON, Plaintiff and Appellant, v.
STATE PERSONNEL BOARD et al., Defendants and Respondents.

## Counsel

Monroe Dyson, in pro. per., and Loretta H. Hellen for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, N. Eugene Hill, Assistant Attorney General, Linda Cabatic and Robert L. Mukai, Deputy Attorneys General, for Defendants and Respondents.

## Opinion

**BLEASE, Acting P. J.**—In this appeal Monroe Dyson challenges the affirmance of his dismissal as a youth counselor with the Department of Youth Authority's Preston School of Industry (Preston or the agency) by the State Personnel Board (Board). The dismissal is predicated solely upon the admission in the administrative disciplinary proceeding of evidence seized by the agency from Dyson's home, consisting of nine T-shirts and two intercoms belonging to Preston. The question we resolve is whether this evidence should have been excluded from the administrative proceedings.

The items were seized from Dyson's home and held by the agency pursuant to a search for evidence that Dyson had committed the crime of theft. The search was initiated, directed and participated in by Thomas Gold, the Preston Chief of Security, acting under his authority as a peace officer. The evidence was turned over by the agency to police authorities for use in a criminal proceeding initiated on the complaint of the agency. The evidence was there excluded and the criminal prosecution dismissed on grounds that the search violated Dyson's constitutional rights to privacy.

We will conclude that the Board is collaterally estopped to deny the constitutional invalidity of the search, as determined in the criminal proceeding. In the circumstances of this case the unconstitutionally seized evidence should have been excluded in the succeeding administrative proceeding conducted by the Board.

### Facts And Procedural Background

Dyson was afforded a hearing before an administrative law judge appointed by the Board. He made a timely objection to the introduction of the evidence seized in the search of his home. The following facts, read most favorably to the agency, are taken from the record of the administrative hearing. However, the facts presented here do not bear on the issue of consent to search Dyson's home, an issue resolved adversely to the agency in the criminal proceeding which preceded the administrative disciplinary proceeding. Rather the facts bear on the question whether the agency was so involved in the search as to justify an exclusionary remedy to deter agency invasion of its employees' constitutional rights.

Mr. Dyson was dismissed from his employment as a youth counselor with the Preston School of Industry. The principal actor in the search was Tom Gold, Preston's Chief Security Officer. Gold was present in the office of Preston Superintendent Richard Colsey on June 12, 1984, when Renate Dyson, Dyson's estranged wife, called to report that Dyson had been stealing items from Preston. Colsey testified that Renate told him that "her husband was bringing things home she thought were State property and she thought he was stealing" and that the subject matters were "video materials, clothing, a telephone, and some other electronic equipment." Colsey assigned Gold to investigate the report.

Gold is a peace officer and pursued the investigation and search acting under that authority. In his view his jurisdiction extends "beyond the Walls of Preston when . . . on duty." (See Pen. Code, § 830.5, subd. (b).) He understood his peace officer status to "include[ ] any activity in the service of the Youth Authority outside the walls of Preston." During the investigation and search of Dyson's house he was acting in that capacity.

Gold "contacted [Renate] that same afternoon that she had talked to Mr. Colsey and informed [her] I would be the one coming down to talk with her, and I asked her if the following day would be okay. And she said yes, it would." Before going to Mrs. Dyson's house on the 12th, Gold "made prior arrangements on the 11th [more likely the 12th] with the Sheriff's Department asking if I needed some assistance if they'd help me out and they said they would . . . ." It thus appears that Gold planned to search the Dyson

house before he interviewed Renate. Gold then went to Renate's house on Miranda drive. Her children were present. By Gold's account, she told him that Dyson was stealing things from Preston. He then called the sheriff's officers again "from [Mrs. Dyson's] house to get the officers to go help me on [Mr. Dyson's] house." Gold said that he called them "and asked them if they would back [him] up if [he] needed it." Apparently he told them nothing about Renate's separation from Dyson and her separate living arrangements. He told the sheriff's officers "that I had permission from the wife to enter the home and that they would—we'd meet them at the address . . . ." Gold knew that Dyson was at work on the day of the search. He knew that Mrs. Dyson had moved out of the Dyson house on Craft but believed that Renate Dyson owned it and had some of her things in it.

After calling and arranging for the sheriff's officers to meet him at the Dyson house on Craft Drive, Gold went there with Mrs. Dyson, a trip of some miles. When asked why he called in the sheriff's office, Gold said: "I just wanted an assistant in going into the house as I don't have the necessary papers for someone to go in to search a house, which they said they would have her sign the day prior. If they got the consent they would have her sign the papers to search the home, . . . . I don't know really how far my Peace Officer's jurisdiction really does go as to what I can do with it . . . ."

On getting into the house Gold testified: "Q: How did you get into the house?

"A. One of the Officers asked Renate if she had a key. She said no . . . and she says that the window was broke out and there was a door over the window by the doorknob. He asked if he could push it open. She said yes, he did open the door on the inside, and on entry said, 'Its a Sac SO. Is anyone home?' And upon no answer, we entered the house."

According to Gold, inside the house Renate led Gold through the house, identifying things as taken from Preston. Gold made notes of identification and seized the items. He took one of the intercoms "just sitting on the nightstand" in the master bedroom and the other was found in the second bedroom. The T-shirts were found by Gold in the closet of the master bedroom where he seized them.

Gold "gathered the material or the property belonging to Preston" and put "it in the trunk of my car" and then dropped Renate off at her house and "then came back to the institution and talked with our Superintendent Richard Colsey." Thereafter (the following day), pursuant to his superior's directions, he took it to the Ione Police Department and logged it in.

The administrative law judge rendered a decision concluding that the nine T-shirts and two intercoms seized at Dyson's house were the property of the Preston School. The judge found that it could not be established that the 11 video tapes were similarly the property of the school. He also found that although a book given Mrs. Dyson by Dyson was the property of the school that Dyson intended to return it and other Preston books to the school. The judge concluded Dyson "did steal State property," to wit, the items seized from Dyson's house.

The findings of fact and proposed decision of the administrative law judge were adopted by the Board. It is that decision which we are asked to review.

*Discussion*

The evidence necessary to support the discipline imposed on Dyson is that seized during the search of his house. The search was initiated and directed by the agency; the evidence was seized and held by the agency, turned over by it to a prosecutorial authority for use in a criminal action, retrieved following its suppression by the court in that proceeding, and introduced in evidence in Dyson's administrative disciplinary hearing.

The dispositive issue is the admissibility of the evidence in the administrative proceeding. That turns, first, on the applicability of an exclusionary rule to the administrative proceeding and, second, on the collateral effect to be given the exclusion of the evidence in the criminal proceeding. We consider these issues seriatim.

I

The decision adopted by the Board provides: "At the criminal hearing, the Judge held that the search of [Dyson's] house was illegal because the wife no longer lived there. The property seized at [the] house was excluded as evidence and the criminal charges were dismissed. [Dyson] argues that the property should also be excluded as evidence in this administrative hearing. The argument is rejected. The exclusionary rules were designed to protect the public from overzealous peace officers. Such rules cannot be used against the public. Exclusionary rules are not available to protect the jobs of dishonest peace officers. (*Emslie* v. *State Bar,* 11 Cal.3d 210.)"

The decision of the Board is predicated upon *Emslie* v. *State Bar* (1974) 11 Cal.3d 210 [113 Cal.Rptr. 175, 520 P.2d 991], and that case is the starting point for our discussion of the applicability of an exclusionary rule in the circumstances of this case. In *Emslie* evidence seized by Nevada police was used in a California State Bar Association disciplinary

proceeding. Notwithstanding that the Nevada evidence was lawfully seized the court volunteered the dictum "that the exclusionary rules are not part of administrative due process in State Bar disciplinary proceedings . . . ." In saying this the court cautioned that "we do not intimate that circumstances could not be presented under which the constitutional demands of due process could not countenance use of evidence obtained by unlawful means in a proceeding conducted by such governmental agency . . . . The application of such rules must be worked out on a case-by-case basis in this and other license revocation proceedings." (*Id.*, at pp. 229-230.)

Of importance in the *Emslie* dictum was the fact that the search which produced the evidence used in the disciplinary proceeding was independently conducted by Nevada police. For that reason the court said: "In applying the exclusionary rules to attorney disciplinary proceedings we find practically no deterrent effect upon any law enforcement officer who might be tempted to use unconstitutional methods to obtain evidence for use in a criminal trial." (11 Cal.3d at p. 229.)

The same point was made the basis of the decision in *Governing Board* v. *Metcalf* (1974) 36 Cal.App.3d 546 [111 Cal.Rptr. 724] in which evidence seized in a wholly independent criminal investigation was made the basis of discipline in a teacher disciplinary proceeding. The court said: "Generally speaking, the policy underlying the exclusionary rule has two aspects. The first and primary one in California is to deter government officials from lawless conduct by denying them a reward for such conduct. [Citation.] The secondary one is to preserve the integrity of the judicial process by keeping it free of the taint of the use therein of improperly obtained evidence." (*Id.*, at p. 549.) As the court noted, only the second of these policies was present. As to the first, the court said: "The police in making investigations of suspected criminal activity are, we surmise, generally completely unaware of any consequences of success in their investigative efforts other than the subsequent criminal prosecution of the suspected offender." (*Ibid.*; see also *In re Martinez* (1970) 1 Cal.3d 641, 649-650 [83 Cal.Rptr. 382, 463 P.2d 734] ["the incremental deterrent effect that will realistically be achieved by shielding the Adult Authority from illegally procured evidence is slight; the bungling police officer is not likely to be halted by the thought that his unlawful conduct will prevent the termination of parole because the authority cannot consider the evidence that he unlawfully procures."])

These reasons for admitting illegally seized evidence in an administrative proceeding have no application to this case. The evidence seized in this case was in no way the independent product of police work. The search was initiated on the basis of allegations of criminal misconduct made to the agency. It was directed by and the evidence was seized and held by the

agency. The agency turned the evidence over to prosecutorial authorities for use in a criminal prosecution, retrieved it following its suppression by the court in the criminal proceeding, and introduced it in evidence in the administrative disciplinary hearing. The sole function of the sheriff's officers present at the scene of the search of Dyson's home was to assist Gold, who was unsure of the extent of his own peace officer powers. They left after the search, consistent with the view they were assisting Gold, leaving the evidence seized in Gold's possession. The evidence was then placed in the trunk of Gold's car and taken to Preston where Gold, pursuant to his *superior's* direction, turned it over to a different police entity, the Ione Police Department, for use in the criminal prosecution of Dyson. The evidence was subsequently suppressed in that proceeding and the criminal charges dismissed on grounds that the search of Dyson's home violated his constitutional rights of privacy.

Thus, setting aside for the moment the collateral estoppel effect of that determination, the narrow question we consider is whether the law requires the exclusion from an administrative disciplinary proceeding of evidence unconstitutionally seized from the employee's home by an agency employee who is a peace officer searching for evidence of theft of agency property. The answer to this question must be yes for each of the policy reasons advanced in *Metcalf*. (See, e.g., 1 LaFave, Search and Seizure (2d ed. 1987) § 1.7(e).)

Attenuation of the deterrent effect of an exclusionary rule by virtue of the fact that the authorities conducting the search had no relation to the agency initiating the disciplinary proceeding is critical to the dictum in *Emslie* and the holding in *Metcalf*. That consideration is not present here. Here the deterrent effect would work directly on the agency conducting the search for evidence of crime. The sole basis of the Board's refusal to consider the exclusion of the evidence seized from Dyson's home is the broad assertion that there is no exclusionary rule for illegally obtained evidence in administrative proceedings.

The invitation "to rule broadly . . . that the exclusionary rule does not apply in police disciplinary proceedings" was recently rejected in *Williams* v. *City of Los Angeles* (1988) 47 Cal.3d 195, 202 [252 Cal.Rptr. 817, 763 P.2d 480]. In *Williams* the Los Angeles Police Department conducted an internal investigation into the manner of making arrests for bookmaking. Two officers were interrogated without being properly advised of their qualified statutory right to remain silent under the Public Safety Officers Procedural Bill of Rights Act. One refused and was fired for insubordination. He was reinstated in *Lybarger* v. *City of Los Angeles* (1985) 40 Cal.3d 822 [221 Cal.Rptr. 529, 710 P.2d 329]. The second answered the questions

and was fired on the basis of his answers. The court considered and rejected the propriety of fashioning an exclusionary rule for the purpose of enforcing the statutory right. It did so because the "prohibition against any use of Williams's statements was not required to ensure he was not prejudiced individually by the failure to advise him of his rights. Nor did that ban measurably increase the incentive to comply with the act beyond what is inherent in our decision in *Lybarger* . . . and the marginal increase in deterrence conceivably afforded by the trial court's order [to exclude the evidence] is so out of scale with its consequences that we cannot find it to have been 'appropriate' within the meaning [of the applicable statute]." (47 Cal.3d at p. 205.)

*Williams, supra,* 47 Cal.3d 195, does not foreclose an exclusionary remedy; to the contrary it suggests its viability in the appropriate circumstances. The court rejected the urging of the city "to rule broadly . . . that the exclusionary rule does not apply in police disciplinary proceedings." (47 Cal.3d at p. 202.) It did so because the case did not involve an attempt to use evidence seized in violation of constitutional restraints. (*Ibid.*) The court directed us to compare *Metcalf, supra,* with *Sullivan* v. *District Court of Hampshire* (1981) 384 Mass. 736 [429 N.E.2d 335] and *City of New Brunswick* v. *Speights* (1978) 157 N.J. Super. 9 [384 A.2d 225]. We do so.

In *Speights, supra,* 384 A.2d 225, the question was whether evidence seized after a search by federal agents of a police officer for purposes of a federal prosecution for illegal possession of a firearm was admissible per se in a subsequent disciplinary proceeding. The opinion found, in dictum, that the policy of deterrence was applicable because of the forseeability of a subsequent disciplinary hearing when the suspect was a police officer.

Neither *Speights* nor *Metcalf,* as we said, involved an agency search of the homes or person or property of agency personnel. On the contrary, *Sullivan* did. In *Sullivan* a nurse was discharged from the Northhampton State Hospital in Massachusetts on grounds he brought marijuana to work. The discharge was predicated upon evidence seized from the nurse's jacket which was found by another employee in a canteen. The court ultimately held that there was no violation of the nurse's Fourth Amendment rights because the initial observation of the jacket and its contents violated no rights of privacy. The court said, however, that as a matter of Massachusetts law, illegally obtained evidence may not be used by the government in a Civil Service Commission proceeding to support the discharge of a public employee.

The *Sullivan* court relied upon *Bd. of Selectmen, etc.* v. *Mun. Ct., etc.* (1977) 373 Mass. 783, 787-788 [369 N.E.2d 1145], which bears similarities

to this case. In that case police officers conducted an unconstitutional search of the home of another police officer. The evidence seized from the home was utilized in a disciplinary proceeding against the officer. The court distinguished purely civil proceedings, saying that the critical issue was the fact that the government sought to sanction an individual by virtue of its unconstitutional action and that the value of judicial integrity weighed heavily in the determination to exclude the evidence.

The reasoning of *Sullivan* and *Bd. of Selectmen* plumbs the line, in the words of *United States* v. *Janis* (1976) 428 U.S. 433, 455 [49 L.Ed.2d 1046, 1061, 96 S.Ct. 3021], "between those cases in which the officer committing the unconstitutional search or seizure was an agent of the sovereign that sought to use the evidence, on the one hand, and those cases, . . . on the other hand, where the officer has no responsibility or duty to, or agreement with, the sovereign seeking to use the evidence." (Fn. omitted.) The *Janis* opinion notes this as a line of distinction in the federal case law, albeit without passing on the point.[1] (*Id.*, at p. 456, fn. 32 [49 L.Ed.2d at p. 1062] and cases cited therein, also see, e.g., *Powell* v. *Zuckert* (D.C. Cir. 1966) 366 F.2d 634; *Saylor* v. *United States* (Ct. Cl. 1967) 374 F.2d 894; *United States* v. *Blank* (N.D.Ohio 1966) 261 F.Supp. 180; *State of Iowa* v. *Union Asphalt & Roadoils, Inc.* (S.D.Iowa 1968) 281 F.Supp. 391, affd. *sub nom. Standard Oil Company* v. *State of Iowa* (8th Cir. 1969) 408 F.2d 1171; *Vander Linden* v. *United States* (S.D.Iowa 1980) 502 F.Supp. 693.)

We are persuaded by our reasoning previously related and by the foregoing cases that the exclusionary rule is available in the circumstances of this case. The unconstitutional search could not have a tighter nexus with the agency that seeks to profit from it. The policy that led to the exclusion of the evidence in the related criminal proceeding fits foursquare with exclusion in the administrative proceedings we review.

The only basis for varying that policy would have to be an assignment of talismanic significance to the terms criminal and administrative. That calls to mind the treatment of a similar suggestion in *People* v. *One 1960 Cadillac Coupe* (1964) 62 Cal.2d 92, 96-97 [41 Cal.Rptr. 290, 396 P.2d 706]: "The People also contend that, conceding the unlawfulness of the seizure, the exclusionary rule should not be applied in a car-forfeiture case, as the action is civil in nature. Whatever the label which may be attached to the proceeding, it is apparent that the purpose of the forfeiture is deterrent in nature

---

[1] In an opinion subsequent to *Janis* a bare majority of the Supreme Court ruled that evidence derived from an unlawful arrest by Immigration and Naturalization Service agents was admissible in deportation proceedings. (*INS* v. *Lopez-Mendoza* (1984) 468 U.S. 1032 [82 L.Ed.2d 778, 104 S.Ct. 3479].) However, the holding is premised upon unique considerations pertinent to deportation.

and that there is a close identity to the aims and objectives of criminal law enforcement. On policy the same exclusionary rules should apply to improper state conduct whether the proceeding contemplates the deprivation of one's liberty or property. (See *People* v. *Cahan,* 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513].)"

Because of the particular nature of the investigation of this case and the extent of agency involvement we conclude that the exclusionary rule applies to remedy the agency invasion of its employee's constitutional rights. The same policy of deterrence would be served by the application of an exclusionary rule in circumstances such as those present here as is served in the application of the rule in criminal proceedings. The Board erred in refusing to consider the application of the exclusionary rule to the administrative disciplinary proceedings. That leads us to consider the collateral effect of the decision in the criminal proceeding to exclude the evidence made the basis of the administrative discipline.

## II

■ In the criminal proceeding, which was initiated on the complaint of the agency on the basis of evidence provided by the agency, the court determined that the evidence was invalidly seized and therefore should be suppressed. The determination of that issue turned on the question of the consent to search allegedly given by Dyson's wife. ■ The prosecution had the burden of proving consent by the preponderance of the evidence. (*People* v. *James* (1977) 19 Cal.3d 99, 106, fn. 4 [137 Cal.Rptr. 447, 561 P.2d 1135].) It failed to meet that burden. The criminal charges were subsequently dismissed. We conclude that the agency is bound by that determination of the invalidity of the search and seizure.

■ Collateral estoppel has traditionally been found to bar relitigation of an issue decided at a previous court proceeding "if (1) the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be relitigated; if (2) the previous [proceeding] resulted in a final judgment on the merits; and if (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior [proceeding]."[2] (*People* v. *Taylor* (1974) 12 Cal.3d 686, 691 [117 Cal.Rptr. 70, 527 P.2d 622]; see also *Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 813 [122 P.2d 892].)

■ The first two prongs are clearly met in this case. At issue in both the criminal trial and the administrative hearing was the validity of the

---

[2] Because mutuality of estoppel is no longer a requirement for the application of the doctrine (see *Bernhard* v. *Bank of America, supra,* 19 Cal.2d 807), privity is a concern with respect to the party against whom the doctrine is asserted.

search and seizure. The criminal proceeding was dismissed after the issue of the validity of the search was fully litigated,[3] and the court ruled the evidence seized was inadmissible. We turn to the third prerequisite for the application of the collateral estoppel doctrine, i.e., privity between the party to be estopped and the unsuccessful party in the prior litigation.

■ The privity requirement has undergone an evolution in the law. "Traditionally it has been held to refer to an interest in the subject matter of litigation acquired after rendition of the judgment through or under one of the parties, as by inheritance, succession or purchase. (*Bernhard, supra,* 19 Cal.2d at p. 811.) The concept has also been expanded to refer to a mutual or successive relationship to the same rights of property, or to such an identification in interest of one person with another as to represent the same legal rights (*Zaragosa* v. *Craven* (1949) 33 Cal.2d 315 [202 P.2d 73, 6 A.L.R.2d 461]; *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co. Ltd.* [1962], *supra*, 58 Cal.2d [601] at p. 604 [25 Cal.Rptr. 559, 375 P.2d 439]; *Rynsburger* v. *Dairymen's Fertilizer Coop., Inc.* (1968) 266 Cal.App.2d 269 [72 Cal.Rptr. 102]) and, more recently, to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is 'sufficiently close' so as to justify application of the doctrine of collateral estoppel (*Lynch* v. *Glass* (1975) 44 Cal.App.3d 943 [119 Cal.Rptr. 139]; *People* v. *One 1964 Chevrolet Corvette Convertible* (1969) 274 Cal.App.2d 720, 731 [79 Cal.Rptr. 447]; *People* ex rel. *State of Cal.* v. *Drinkhouse* (1970) 4 Cal.App.3d 931, 939 [84 Cal.Rptr. 773].)" (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 875 [151 Cal.Rptr. 285, 587 P.2d 1098].)[4] Three reasons cited in support of the application of the doctrine beyond that of the identity of the parties are protection against vexatious litigation, achievement of finality of litigation in which public interests are involved,

[3] The record reveals that in the criminal proceeding the district attorney sought to justify the warrantless search solely on the ground that Dyson's wife consented to the search. The trial court found that no consent was given.

[4] In *Clemmer* v. *Hartford Ins. Co., supra,* 22 Cal.3d 865, following a second degree murder verdict against a defendant in a criminal trial, the victim's family filed a wrongful death suit seeking recovery from defendant's liability insurer. The insurance company defended the action on the ground the killing was a willful act and thus excluded from coverage. The insurance company claimed that the victims were collaterally estopped by defendant's second degree murder conviction from contending the killing was not willful; their claim was that the victim's family was in privity with the defendant because their rights derived from defendant's insurance policy. The court rejected the collateral estoppel claim and concluded that the requisite privity did not exist because the victim's family's interests in litigating the willfulness issue differed from those of the defendant at the criminal trial. The court, noting that at conclusion of the guilt phase of the criminal trial the defendant withdrew his previous plea of not guilty by reason of insanity, asserted that the withdrawal of the plea may have been a result of defendant's determination that the sentence to be served by him under a second degree murder conviction would be preferable to the possible consequence of his prevailing on an insanity plea, i.e., a state mental hospital commitment.

and promotion of the stability of adjudications in prior criminal actions. (See *Lynch* v. *Glass* (1975) 44 Cal.App.3d 943, 947.)

In *People* v. *One 1964 Chevrolet Corvette Convertible* (1967) 274 Cal.App.2d 720 [41 Cal.Rptr. 290, 396 P.2d 706], following a defendant's conviction for possession of marijuana, the owner of the vehicle used in the offense, i.e., the defendant's father, was precluded in a forfeiture action from relitigating the issue of the defendant's knowledge of the presence and nature of the marijuana found in the vehicle. The court asserted that "[w]hen the issue of [the defendant's] knowledge was litigated in the criminal trial, the owner's interest in the Corvette was adequately represented by the defense. [The defendant] testified therein that he had no knowledge of the presence of the marijuana in the vehicle. He had both the incentive and opportunity to adequately and fully litigate the issue under 'rigorous safeguards against unjust conviction.'" (*Id.*, at p. 730; see also *People* ex rel. *State of California* v. *Drinkhouse* (1970) 4 Cal.App.3d 931 [84 Cal.Rptr. 773] [following finding in criminal action of invalidity of deed based on tax collector's illegal conveyance of property under a tax sale in which he had a financial interest, grantees could not relitigate in subsequent quiet title action issue of tax collector's financial interest, even though they were not parties to the criminal action nor in control of the prosecution; the court asserted that the case involved a "public interest" and inconsistent verdicts would be "unsettling to public confidence in the judicial process" and would adversely affect the "orderliness of titles."].)

As one commentator has noted, the determination whether a party is in privity with another for purposes of collateral estoppel is a policy decision. "[T]he term 'privity' in itself does not state a reason for either including or excluding a person from the binding effect of a prior judgment, but rather it represents a legal conclusion that the relationship between the one who is a party on the record and the non-party is sufficiently close to afford application of the principle of preclusion. The emphasis in the analysis is upon the policy of ending litigation where there has been a fair trial of one's interests, as it has been observed that 'the doctrine of res judicata is primarily one of public policy and only secondarily of private benefit to individual litigants.'" (Vestal, *Preclusion/Res Judicata Variables: Parties* (1964) 50 Iowa L.Rev. 27, 45, fn. omitted; see also *People* ex rel. *State of Cal.* v. *Drinkhouse, supra,* 4 Cal.App.3d at p. 937.)

■ However, the expanded notions of privity notwithstanding, collateral estoppel may be applied only if the requirements of due process are satisfied. (*Clemmer* v. *Hartford Ins., supra,* 22 Cal.3d at p. 875.) "In the context of collateral estoppel, due process requires that the party to be estopped must have had an identity or community of interest with, and

adequate representation by, the losing party in the first action as well as that the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication. [Citation.] Thus, in deciding whether to apply collateral estoppel, the court must balance the rights of the party to be estopped against the need for applying collateral estoppel in the particular case, in order to promote judicial economy by minimizing repetitive litigation, to prevent inconsistent judgments which undermine the integrity of the judicial system, or to protect against vexatious litigation. [Citations.]" (*Ibid.*)

In *People* v. *Sims* (1982) 32 Cal.3d 468 [186 Cal.Rptr. 77, 651 P.2d 321], the Supreme Court held that the administrative decision exonerating a welfare recipient of welfare fraud precluded the district attorney from pursuing a criminal action against the recipient for the same alleged misconduct. The administrative agency involved in the first action, a "fair hearing" action, was the Social Services Department of Sonoma County. The district attorney's claim that it was not bound by the previous administrative determination on the ground that the county and the district attorney are not in privity with each other was rejected by the court. The court asserted " 'Privity is essentially a shorthand statement that collateral estoppel is to be applied in a given case; there is no universally applicable definition of privity.' [Citation.] The concept refers "to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is 'sufficiently close' so as to justify application of the doctrine of collateral estoppel.' [Citations.]" (*Id.*, at pp. 486-487.)

The *Sims* court went on to find that the office of the district attorney and the county were "sufficiently close" to warrant application of the doctrine. "Both entities are county agencies that represented the interests of the State of California at the respective proceedings. The district attorney's office represents the State of California in the name of the 'People' at criminal prosecutions. . . . At fair hearings, the county welfare department acts as the 'agent' of the State. '[T]he courts have held that the agents of the same government are in privity with each other, since they represent not their own rights but the right of the government. (Fn. omitted.)' [Citations.]" (*Sims, supra,* 32 Cal.3d at p. 487; see also *Lerner* v. *Los Angeles City Board of Education* (1963) 59 Cal.2d 382, 396-399 [29 Cal.Rptr. 657, 380 P.2d 97], [city board of education bound by waiver of State Board of Education in part because city board serves as an agency of the state].) The court further noted that the close association between the county and the district attorney's office could be seen from the fact that the agencies operate jointly in investigating and controlling welfare fraud. Information gathered by the county is also used by the district attorney; if fraud evidence is uncovered by the county, it must request issuance of criminal complaint from the

district attorney. The court also noted that, upon request, the "County must provide documentary evidence to the district attorney and ensure the appearances of investigators and other county officials at hearings and trials" (32 Cal.3d at p. 488) and that in that particular case "both the criminal complaint charging respondent with fraud and the declaration filed in support of the complaint were signed by personnel of the [County Department of Social Services]." (*Id.*, at p. 488, fn. 17.)

Relying on *Sims,* this court in *Buttimer* v. *Alexis* (1983) 146 Cal.App.3d 754 [194 Cal.Rptr. 603] held that the Department of Motor Vehicles was collaterally estopped from relitigating the lawfulness of the petitioner's arrest after a criminal court in connection with a Penal Code section 1538.5 suppression motion had ruled the arrest unlawful. The judgment commanding the DMV to set aside its order of suspension of the petitioner's drivers license for refusing to submit to a chemical test was affirmed on appeal. This court asserted that although "DMV may have no control over the actions of the District Attorney, however, the district attorney represents the State of California in criminal matters, and DMV represents the interests of the State of California in its hearings." (*Id.*, at p. 760.) We thus concluded that the State of California was the real party in interest in both proceedings and that therefore the requirements of privity for the application of collateral estoppel were satisfied. (Accord *Shackelton* v. *Department of Motor Vehicles* (1975) 46 Cal.App.3d 327 [119 Cal.Rptr. 921]; contra *Pawlowski* v. *Pierce* (1988) 202 Cal.App.3d 692 [249 Cal.Rptr. 49]; see also *Carmel Valley Fire Protection Dist.* v. *State of California* (1987) 190 Cal.App.3d 521, 534-537 [234 Cal.Rptr. 795] [State Board of Control's determination that county was entitled to reimbursement from state for certain expenditures on ground they were state mandated was binding on defendants state, State Department of Finance, State Department of Industrial Relations, State Board of Control, State Controller, State Treasurer and Los Angeles County Auditor Controller in an action by other counties for reimbursement: "Each of these defendants is an agent of the State of California[,] had a mutual interest in the Board proceedings [and] . . . are thus in privity with those state agencies which did participate below . . . ." (*Id.*, at p. 536.)

■ We turn to the circumstances of this case. Here, Dyson is seeking the benefit of the trial court's ruling on the search and seizure issue he litigated below and is attempting to preclude the agency from relitigating the issue. The agency was not a party in the criminal action. However, we consider whether the agency had a "sufficiently close" relationship with the district attorney to warrant application of the collateral estoppel doctrine.

We note initially that the agency (Youth Authority) is a state agency. (Welf. & Inst. Code, § 1700 et seq.) It was represented at the administrative

hearing by the state Attorney General.[5] The criminal action was prosecuted by the district attorney, representing the People of the State of California. Under some of the cases cited above, the fact that the "State" was involved in both actions might be considered sufficient justification to preclude the agency from relitigating the search and seizure issue. However, we do not rely on the mere characterization of both entities as agents of the "State" to find the application of collateral estoppel justified here.

The circumstances of this case reveal a "close relationship" between the significant actors in both proceedings from the very inception of the search. The search was initiated by Gold, an agent of the Youth Authority, who called in the sheriff's department for assistance. The sheriff's department serves as the investigative arm for the district attorney. Manifestly, Gold was conscious of the criminal law overlap. From the very start, a convergence between the disciplinary interests and the penal interests was evident. Evidence seized was originally retained by Gold and then later turned over to the sheriff's department. The criminal action was initiated on the complaint of Preston (the Youth Authority). Gold presumably testified at the criminal suppression motion, presenting evidence relating to the validity of the search. ██ ██ As a witness, he had every incentive to accurately portray the sequence of events leading up to the search.[6] Because a criminal conviction of theft would have constituted cause for the discipline of Dyson under the civil service laws (Gov. Code, § 19572, subd. (k), the agency's disciplinary interest in the criminal proceeding was direct. The district attorney had every incentive to vigorously litigate the issue of the legality of the search. The agency (through its agents) was the chief "accuser" at the criminal proceeding. Its role at the disciplinary hearing was the same. The litigation objectives of the district attorney and the Attorney General in their respective proceedings were identical.

Given the purposes of the doctrine of collateral estoppel, i.e., to promote judicial economy by minimizing repetitive litigation and to prevent inconsistent judgments which undermine the integrity of the judicial system (*People* v. *Taylor, supra,* 12 Cal.3d at p. 695), we see no reason why the doctrine should not be applied here. The agency should not be given the opportunity to relitigate the validity of the search and seizure. The relationship between the district attorney in the criminal proceeding and the agency was sufficiently close to warrant preclusion of the relitigation of the issue in the disciplinary hearing.

---

[5] We recognize that the Attorney General wears many hats and was not functioning in a criminal prosecutorial role when representing the agency in this disciplinary action.

[6] We recognize that the fact that an individual appears as a witness in an action does not in and of itself support a finding of privity with a party in that action for purposes of the application of collateral estoppel in a subsequent proceeding. (*Minton* v. *Cavaney* (1961) 56 Cal.2d 576, 581 [15 Cal.Rptr. 641, 364 P.2d 473].)

■ For these reasons we conclude that the agency is collaterally estopped to deny the invalidity of the search for and seizure of this evidence.

### Disposition

The judgment is reversed. The case is remanded to the trial court with the direction to issue a peremptory writ of mandate compelling the State Personnel Board to set aside Dyson's dismissal as an employee of the Department of Youth Authority's Preston School of Industry. Appellant shall recover his costs on appeal.

Carr, J., and Sparks, J., concurred.

Respondents' petition for review by the Supreme Court was denied November 16, 1989. Lucas, C. J., and Kaufman, J., were of the opinion that the petition should be granted.