[No. B223542. Second Dist., Div. Four. Feb. 23, 2012.]

ADETOKUNBO SHOYOYE, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES, Defendant and Appellant.

COUNSEL

Casselman Law Offices, Gary S. Casselman and Danielle Casselman for Plaintiff and Appellant.

Hurrell Cantrall, Thomas C. Hurrell and Melinda Cantrall for Defendant and Appellant.

OPINION

SUZUKAWA, J.—

## INTRODUCTION

Defendant, the County of Los Angeles (County), appeals from a judgment after jury verdict in favor of plaintiff Adetokunbo Shoyoye arising out of Shoyoye's wrongful detention in County jail. The County acknowledges that although its initial detention of Shoyoye was justified, it overdetained him by about 16 days as a result of unintentional clerical error. The County contends on appeal that the evidence presented at trial was insufficient to support a verdict in favor of Shoyoye pursuant to Civil Code section 52.1 (the Tom Bane Civil Rights Act).[1] In this case of first impression, we agree and conclude that not every wrongful detention is a violation of section 52.1. The evidence here was insufficient to establish the "threats, intimidation, or coercion" necessary to implicate section 52.1. Accordingly, we reverse the judgment as to that cause of action, and reverse the award of attorney fees made pursuant to that statute. We affirm the judgment and damage award in favor of Shoyoye on his claim for false imprisonment.

## FACTUAL BACKGROUND

*The Operative Complaint*

Plaintiff's third amended complaint alleged causes of action for (1) violations of Penal Code section 1384; (2) false imprisonment; (3) violation of section 52.1; (4) violation of 42 United States Code section 1983; and (5) negligence and negligence per se. The trial court granted the County's motion for nonsuit as to the 42 United States Code section 1983 cause of action, and prior to the case being submitted to the jury, the parties agreed that they would present for the jury's consideration only the causes of action for false imprisonment and violation of section 52.1.

---

[1] All further undesignated statutory references are to the Civil Code.

*Shoyoye's Arrest and Incarceration*

The evidence presented at trial included the following undisputed facts. Shoyoye was lawfully arrested on August 19, 2007, when he was reporting an unrelated incident to the police, and the police discovered he had two outstanding warrants.[2] The first warrant related to his failure to address a citation he received for riding the subway without a ticket, and the second warrant arose when a former roommate stole his identity and was convicted of grand theft under Shoyoye's name. Shoyoye was incarcerated, and shortly thereafter he appeared in court and was ordered released on the first warrant. A few days later he appeared on the second warrant in a different court, and that matter was also resolved in his favor. On August 22, 2007, he was ordered released, subject to any other holds. He was transported back to Men's Central Jail, where he was processed and placed in a dormitory, expecting to be released at any time.

*The Error Resulting in Shoyoye's Overdetention*

A County employee mistakenly attached to Shoyoye's paperwork information pertaining to a parolee scheduled to be sent to state prison for violating the terms of his parole. The other prisoner's name was Marquis Lance Parsee. A "Department of Corrections hold" (DCL) intended for Parsee was entered into the County Sheriff's computer system regarding Shoyoye. A subsequent quality control check failed to detect the error. If a County employee had looked at the paper file on Shoyoye rather than the computer records, he or she would have realized that the DCL hold did not pertain to Shoyoye.

*Shoyoye's Efforts to Be Released, and the County Employees' Treatment of Him*

While he was at Men's Central Jail, Shoyoye attempted to ask one deputy or another almost every day about being released, but he received no assistance. Shoyoye was then transferred to the Pitchess Detention Center in Castaic, where he was processed and assigned a bed in a dormitory. He did not understand why he was not being released.

Shoyoye asked a total of six to eight people for assistance during his incarceration. At Pitchess Detention Center, inmates were periodically permitted to submit one written question on a "yellow sheet" form. Shoyoye submitted such a form asking, "Why am I here?" He received the response that he was subject to a "DCL hold." He submitted another form inquiring what a "DCL hold" was, along with one other question, and received the

---

[2] Shoyoye conceded that there was probable cause for his arrest and initial detention.

response that he was only entitled to ask one question and he had asked two. He submitted other yellow sheets indicating he believed he should not be there, but he received no helpful responses.

Shoyoye told custody assistant Lawrence Wong that he thought he should be released. Wong acknowledged that if what he said was true, then there was a problem. Wong told him to talk to Deputy Niels Gittisarn. Shoyoye asked him for assistance, and Gittisarn told him, "Get back to me." However, when Shoyoye attempted to speak to him the next day, Gittisarn rebuffed him, yelling that he was busy. Other inmates accused Shoyoye of being an informant when they saw him talking to Gittisarn, and thereafter he was hesitant to approach any County employees for fear of being labeled an informant.

Shoyoye asked a deputy named Rodriguez what a DCL hold was, and Rodriguez replied, "[T]hat means that you are going to prison, boy." Rodriguez asked what he had done, and when Shoyoye said it was for not having a ticket on the subway, Rodriguez lost interest.

Shoyoye attended a church service in order to speak to the jail chaplain about his plight. The chaplain listened sympathetically, but did not offer assistance.

Deputy Oren Son monitored the laundry facility where Shoyoye worked. Shoyoye told him that he was being held for a felony he did not commit. Son looked at him as he spoke, but then returned to the book he was reading and gave him the silent treatment for a few minutes, until Shoyoye eventually gave up and walked away. Shoyoye knew that if a laundry worker took breaks or refused to work, he would be subjected to harsh housing discipline and suspension of privileges. Shoyoye asked a civilian employee who worked in the laundry facility, Patsy Hazlett, for assistance after she praised him for good work performance, but she said she could not help him.

Asked if any of his efforts resulted in anything being done to determine his overdetention status, he replied, "All I got was disinterest, being sent away. No. Nothing was done." He felt that he had failed to make himself heard, that although he was civil and polite he got nowhere: there was no " 'customer service,' if you will." He described the deputies as walking and talking tough. Shoyoye thought about escaping but feared he would get shot; he never seriously considered doing so.

Incident to his incarceration, Shoyoye was subjected to strip searches that included anal cavity searches, required to wait naked in line to shower in close proximity to other inmates, and shackled. On one occasion, he was

showering when he was approached by an aggressive inmate, and he immediately fled the shower room, still covered in soap. He witnessed criminal activity and fights, and was housed in a large dormitory with hundreds of inmates, many of whom were gang members. He did not drink water because the commode was connected directly to the drinking fountain. He was exposed to a chicken pox outbreak. He feared being sent to prison, or put into "the hole" for further discipline, or having physical force or violence used against him. He was mistaken for an informant by other inmates and feared what they might do to him.

*Shoyoye's Release*

Shoyoye's roommate, Rudy Ramirez, located him at Pitchess Detention Center and visited him there. Shoyoye asked Ramirez to contact Shoyoye's boss, Benjamin Swett, and Ramirez did so. Eventually Swett contacted a state Assembly man's office, and was put in touch with Renee Hansen, the chief of legislative affairs for California's Department of Corrections and Rehabilitation (CDCR). She located Shoyoye in the County's Web site, and found a reference to a CDCR number. She telephoned the inmate locator for CDCR and inquired to whom that CDCR number pertained, and was told it was Marquis Parsee. She then ascertained that Parsee was also being held in the County jail, under the same parole hold number as Shoyoye. She contacted the County jail and informed them of her suspicion that they had applied an erroneous parole hold number to Shoyoye. They concluded she was correct, and immediately took steps to effect Shoyoye's release. Shoyoye was released on September 7, 2007, 16 days after he had been ordered released on August 22, 2007.

*The Verdict, the Judgment, and the Posttrial Motions*

A special verdict form was submitted to the jury. The jury answered each of the following questions in the affirmative: (1) "Did the County of Los Angeles hold [Shoyoye] in custody?"; (2) "Was there an unnecessary delay in releasing [Shoyoye]?"; (3) "Was the County of Los Angeles' conduct a substantial factor in causing harm to [Shoyoye]?"; (4) "Did the employee(s) of the County of Los Angeles intentionally act or fail to act with [respect to Shoyoye's] right to be free from the unreasonable seizure by actual or implied use of threats, intimidation or coercion?"; and (5) "Was the County of Los Angeles' employee(s') conduct in violating plaintiff [Shoyoye's] right to be free from unreasonable seizures a substantial factor in causing harm to [Shoyoye]?" The jury awarded Shoyoye $22,700 in economic damages for past and future lost earnings and property loss, and $180,000 in noneconomic damages for past and future pain and suffering.

The court pointed out to counsel that "issues could be raised that the damages go to separate causes of action. And these are distinctly different causes of action." The court inquired whether counsel wanted to direct the jury to indicate whether the damages it awarded were as to each cause of action. Shoyoye's counsel objected to any apportionment request, while counsel for the County was in favor of it. The court decided not to seek further elaboration or apportionment from the jury. The court entered judgment in favor of Shoyoye on February 1, 2010.

The County then filed a motion for judgment notwithstanding the verdict and a motion for new trial, arguing that the evidence at trial was insufficient as a matter of law to support the jury's verdict regarding the section 52.1 claim because Shoyoye failed to present any evidence that County employees violated his constitutional rights by the use of threats, intimidation, or coercion. Extensive briefing of the issue ensued.

Ultimately, the court denied the County's posttrial motions. Thereafter, the County filed a timely notice of appeal from both the judgment and the order denying its posttrial motions.[3]

## DISCUSSION

### I.  *Standard of Review*

Denial of defendant's motion for judgment notwithstanding the verdict is reviewed to determine whether substantial evidence supports the jury verdict. (*Dell'Oca v. Bank of New York Trust Co., N.A.* (2008) 159 Cal.App.4th 531, 554–555 [71 Cal.Rptr.3d 737].)

"Under [the substantial evidence] standard of review, our duty 'begins and ends' with assessing whether substantial evidence supports the verdict. [Citation.] '[The] reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' [Citation.] We review the evidence in the light most favorable to the respondent, resolve all evidentiary conflicts in favor of the prevailing party and indulge all reasonable inferences possible to uphold the jury's verdict. [Citation.]" (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 908 [28 Cal.Rptr.3d 894].) However,

---

[3] We reject Shoyoye's contention that the County admitted liability at trial and has therefore forfeited any argument to the contrary. Shoyoye concedes, and the record makes clear, that defense counsel argued that any violation of plaintiff's constitutional rights was not intentional, but due to a mistake, and was not accomplished by means of threats, intimidation, or coercion.

Without specifically deciding the issue, we assume for purposes of this opinion that a constitutional violation occurred and that Shoyoye was unreasonably detained beyond the time detention was justified.

issues of statutory interpretation and of application of a statute to undisputed facts are reviewed de novo. (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284 [73 Cal.Rptr.2d 596].)

II. *Statutory Interpretation*

We begin with the language of section 52.1, sometimes referred to as the Tom Bane Civil Rights Act. It provides in relevant part as follows:

"(a) If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured. . . .

"(b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured." The statute further provides in subdivision (h) that "In addition to any damages, injunction, or other equitable relief awarded in an action brought pursuant to subdivision (b), the court may award the petitioner or plaintiff reasonable attorney's fees."

Throughout the pendency of this matter, Shoyoye has predicated the County's liability under section 52.1 solely on a claim of interference with either the Fourth Amendment to the United States Constitution or article I, section 13 of the California Constitution, which both pertain to the right of the people to be secure against unreasonable searches and seizures.[4]

■ "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not

---

[4] Although the parties discuss whether the County is a person within the meaning of the statute, we do not find it necessary to answer that question in order to resolve this appeal.

required to do under the law. (*Jones* [*v. Kmart Corp.* (1998)] 17 Cal.4th [329,] 334 [70 Cal.Rptr.2d 844, 949 P.2d 941].)" (*Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 883 [57 Cal.Rptr.3d 454].) The legislative history of section 52.1, enacted in 1987, makes clear that the crucial motivation behind passage of section 52.1 was to address the increasing incidence of hate crimes in California. (Stats. 1987, ch. 1277, § 3, p. 4544; see *Jones v. Kmart Corp., supra*, at p. 338 (*Jones*).) However, the statutory language does not limit its application to hate crimes. Notably, the statute does not require a plaintiff to allege the defendant acted with discriminatory animus or intent based upon the plaintiff's membership in a protected class of persons. (Cf. § 51.7; *Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 841–843 [11 Cal.Rptr.3d 692, 87 P.3d 1] (*Venegas II*).) A defendant is liable if he or she interfered with or attempted to interfere with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion. (*Venegas II, supra*, at p. 843.)

In *Venegas II*, sheriff's deputies stopped a car in which a husband and wife were driving, based on the husband's resemblance to a suspect in an ongoing investigation of an automobile theft ring. The car had no license plates or visible vehicle identification number. The husband informed the officers that he was the brother of the person they were looking for, but when asked to produce identification he said it was at his home nearby. He declined to sign an entry and search waiver form to allow the officers to enter his home and retrieve his identification, instead agreeing the officers could accompany his wife to their home to get it. One officer assured the couple their home would not be searched. However, upon reaching the home, the officers convinced the wife to sign a broadly worded entry and search waiver form granting them authority to enter the house and conduct a search. Officers searched the entire house and found papers showing the husband was on felony probation. They directed the officers detaining the husband to arrest him for a misdemeanor Vehicle Code violation and for violating his probation; he was later booked into custody. The officers detained the wife for two hours but did not arrest her or charge her with anything. They determined the following day that the car was not stolen, and directed that the husband be released from custody. He was released two days later; no charges were ever filed against him. The husband and wife filed an action against individual officers involved in the incident, the city and county, and the county sheriff's department. The plaintiffs' complaint included causes of action on the husband's behalf under section 52.1, and for false detention and arrest. (*Venegas II, supra*, 32 Cal.4th at pp. 827–828.) The matter was tried, and the trial court granted nonsuit in favor of the defendants. (*Id.* at p. 828.)

The Supreme Court reversed, holding that the trial court erred in requiring the plaintiffs to allege they were members of a protected class in order to maintain a cause of action under section 52.1 based on unreasonable search

and seizure. "According to County, the section applies only to so-called hate crimes and requires a showing, not alleged here, that the defendants acted with 'discriminatory animus,' i.e., an intent to threaten or coerce another in violation of their constitutional rights, based on the victim's actual or apparent racial, ethnic, religious, or sexual orientation or other minority status. [Citation.] We disagree, as nothing in Civil Code section 52.1 requires any showing of actual intent to discriminate." (*Venegas II, supra*, 32 Cal.4th at p. 841.) The Supreme Court noted that section 52.1, subdivision (g) states that an action brought under that section is " 'independent of any other action, remedy, or procedure that may be available to an aggrieved individual under any other provision of law,' " including section 51.7, which does require allegations of violence or intimidation because of the victim's actual or apparent characteristics (for example, race, sexual orientation, or disability). (*Venegas II, supra*, at pp. 841–842.) Indeed, section 52.1 was amended in 2000 to add language to subdivision (g) in order to clarify that the section applies to an affected plaintiff without regard to his or her membership in a protected class. (Stats. 2000, ch. 98, § 3, p. 1533; *Venegas II, supra*, at p. 842.)

The *Venegas* court acknowledged that in *Jones, supra*, 17 Cal.4th 329, 338, it had stated that section 52.1 was adopted " 'to stem a tide of hate crimes' " (*Venegas II, supra*, 32 Cal.4th at p. 843), but asserted that "our statement did not suggest that section 52.1 was limited to such crimes, or required plaintiffs to demonstrate that County or its officers had a discriminatory purpose in harassing them, that is, that they committed an actual hate crime." (*Venegas II, supra*, at p. 843.) The court disagreed, however, with the county's assertion that such an interpretation would mean that section 52.1 would apply in all tort actions. "Civil Code section 52.1 does not extend to all ordinary tort actions because its provisions are limited to threats, intimidation, or coercion that interferes with a constitutional or statutory right. . . . [W]e need not decide here whether section 52.1 affords protections to every tort claimant, for plaintiffs in this case have alleged unconstitutional search and seizure violations extending far beyond ordinary tort claims. All we decide here is that, in pursuing relief for those constitutional violations under section 52.1, plaintiffs need not allege that defendants acted with discriminatory animus or intent, so long as those acts were accompanied by the requisite threats, intimidation, or coercion. The Court of Appeal was correct in holding that plaintiffs adequately stated a cause of action under section 52.1." (*Venegas II, supra*, at p. 843.)

Unlike the Supreme Court in *Venegas II*, we are indeed required to decide here whether section 52.1 affords protection to every claimant who alleges interference with his or her right to be free of an unreasonable seizure, i.e., overdetention beyond the time lawfully permitted, where the overdetention occurs because of mere negligence rather than a volitional act intended to

interfere with the exercise or enjoyment of the constitutional right. In other words, if the circumstances of the overdetention are coextensive with those that would support a tort claim for negligent false imprisonment, and do not involve any additional showing of ill will or blameworthy conduct, is section 52.1 applicable? Shoyoye contends that the intimidation and coercion inherent in being incarcerated is sufficient to show that defendant interfered by threats, intimidation, or coercion with his right to be free from an unreasonable seizure. Naturally the County disagrees. We are thus called upon to decide this issue of first impression, which we conceptualize as involving two related questions: What type of interference is contemplated by the statute—intentional and callous interference only or also incidental interference brought about by negligent conduct? As applicable here, where coercion is inherent in the constitutional violation alleged, as it is in an unreasonably prolonged detention, is the statutory requirement satisfied or does the statute require a showing of coercion independent from the coercion inherent in the wrongful detention itself?

### A.   *Intentional Interference with a Constitutional Right*

■   " 'The objective of statutory interpretation, of course, is to ascertain and effectuate legislative intent. If the words are clear, a court may not alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.] At the same time, however, a statute is not to be read in isolation; it must be construed with related statutes and considered in the context of the statutory framework as a whole. [Citation.] A court must determine whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other related provisions.' (*Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 986 [44 Cal.Rptr.2d 93].)" (*Hicks v. E.T. Legg & Associates* (2001) 89 Cal.App.4th 496, 505 [108 Cal.Rptr.2d 10].)

■   The statutory framework of section 52.1 indicates that the Legislature meant the statute to address interference with constitutional rights involving more egregious conduct than mere negligence. Subdivision (e) contains a provision that directs the plaintiff to inform his or her local law enforcement agency of orders made pursuant to the section, such as for injunctive relief, in "locations where the court determines that *acts of violence* against the plaintiff are likely to occur." (Italics added.) Similarly, subdivision (j) states that: "Speech alone is not sufficient to support an action brought pursuant to subdivision (a) or (b), except upon a showing that the speech itself *threatens violence* against a specific person or group of persons; and the person or group of persons against whom the threat is directed reasonably fears that, because of the speech, *violence* will be committed against them or their property and that the person *threatening violence* had the apparent ability to

carry out the threat." (Italics added.) ■ While we are not prepared to and need not decide that every plaintiff must allege violence or threats of violence in order to maintain an action under section 52.1 (see, e.g., *Cabesuela v. Browning-Ferris Industries of California, Inc.* (1998) 68 Cal.App.4th 101 [80 Cal.Rptr.2d 60]), we conclude that the multiple references to violence or threats of violence in the statute serve to establish the unmistakable tenor of the conduct that section 52.1 is meant to address. The apparent purpose of the statute is not to provide relief for an overdetention brought about by human error rather than intentional conduct.

We further note that when section 52.1 was amended in 1990 to allow plaintiffs to recover monetary damages in addition to the remedy of injunctive relief the statute originally provided (Stats. 1990, ch. 392, § 1, p. 1749), the Legislature also considered, but rejected, a proposal to delete the language requiring interference "by threats, intimidation, or coercion." A bill analysis prepared by the Department of Justice commented that "As a general proposition, statutory or common law remedies are already available to redress interference with rights protected by state or federal constitutions or laws (e.g., tort). Civil Code § 52.1 focuses specifically on the <u>additional</u> element present especially in hate violence, viz., putting persons in fear of their safety. It is the element of threat, intimidation, or coercion that is being emphasized in Civil Code § 52.1. [¶] The proposed deletion would, in effect, make the civil rights remedy as an alternative cause of action in virtually every tort action: <u>Any</u> tort (and, perhaps, some contractual interferences) could be characterized as interference with 'rights secured by the Constitution or laws of the United States or of rights secured by the Constitution of laws of this state.' " (Dept. of Justice, Analysis of Assem. Bill No. 2683 (1989–1990 Reg. Sess.) Mar. 1, 1990, p. 2; see also Assem. Com. on Judiciary, hearing on Assem. Bill No. 2683 (1989–1990 Reg. Sess.) Mar. 7, 1990 pp. 2–3: "Does not the inclusion of the terms [threats, intimidation, or coercion] clearly define the types of interferences that the Act originally intended to curb (i.e. hate violence)?") The legislative history thus supports our conclusion that the statute was intended to address only egregious interferences with constitutional rights, not just any tort. The act of interference with a constitutional right must itself be deliberate or spiteful.

B.   *Coercion Inherent in a Detention Is Insufficient*

■ Thus, we conclude that where coercion is inherent in the constitutional violation alleged, i.e., an overdetention in County jail, the statutory requirement of "threats, intimidation, or coercion" is not met. The statute requires a showing of coercion independent from the coercion inherent in the wrongful detention itself.

The issue was squarely presented in a federal district court case, *Gant v. County of Los Angeles* (C.D.Cal. 2011) 765 F.Supp.2d 1238 (*Gant*). There, several plaintiffs alleged federal and state constitutional violations arising from their arrests and subsequent detentions on warrants intended for different people. Having determined that there was no California case law addressing the issue, the *Gant* court looked to a Massachusetts decision, *Longval v. Commissioner of Correction* (1989) 404 Mass. 325 [535 N.E.2d 588] (*Longval*), appropriately so because section 52.1 was modeled closely on the Massachusetts Civil Rights Act of 1979. (*Gant, supra*, at p. 1253; see *Jones, supra*, 17 Cal.4th at p. 335.) The court in *Gant* observed: "Massachusetts case law suggests that the statute's coercion element is not met merely because the constitutional violation itself is inherently coercive. In [*Longval*], the Massachusetts Supreme [Judicial] Court considered a prisoner's claim under the corresponding state civil rights law that his rights were violated when he was unlawfully transferred to an administrative segregation unit in another prison without a hearing. [(*Longval, supra*, at p. 590.)] There, the court held that '[a] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act.' [Citation.] Thus, it held, 'we see no coercion, within the meaning of the . . . Act, simply from the use of force by prison officials, authorized to use force, in order to compel a prisoner to do something he would not willingly do, even if it turns out that the official had no lawful right to compel the prisoner to take that action.' [Citation.] Because the use of force was intrinsic to the alleged violation itself, it did not also satisfy the additional 'force' or 'coercion' element of the statute." (*Gant, supra*, 765 F.Supp.2d at p. 1253, quoting *Longval, supra*, at p. 593.) The *Longval* court observed: "Shackling and handcuffing Longval and taking him to Concord was not by itself coercive under the Civil Rights Act, as Longval claims. If the officials had *some further purpose* in treating Longval as they did, threats, intimidation, or coercion might be involved. Conduct, even unlawful conduct, however, lacks these qualities when all it does is take someone's rights away directly. [Citation.]" (*Longval, supra*, at p. 593, italics added.)

The *Gant* court adopted this analysis and rejected the section 52.1 claims of the wrongfully arrested plaintiffs, holding that: "[A] wrongful arrest and detention, without more, cannot constitute 'force, intimidation, or coercion' for purposes of section 52.1." (*Gant, supra*, 765 F.Supp.2d at pp. 1253–1254.) "[S]ection 52.1 requires a showing of coercion independent from the coercion inherent in a wrongful detention itself." (*Id.* at p. 1258.) We agree.

We note the contrary holding in *Cole v. Doe* (N.D.Cal. 2005) 387 F.Supp.2d 1084 in which the federal district court held that the "[u]se of law enforcement authority to effectuate a stop, detention (including use of handcuffs), and search can constitute interference by 'threat[], intimidation, or coercion'

if the officer lacks probable cause to initiate the stop, maintain the detention, and continue a search." (*Id.* at p. 1103.) However, we do not find the case persuasive because the *Cole* court's analysis focused on whether the use or attempted use of excessive physical force or violence must be alleged (concluding that it did not). (*Id.* at pp. 1103–1104.) Our focus is not so limited.

### C. *Shoyoye Did Not Prove Coercion Independent from That Inherent in a Wrongful Detention*

The evidence presented at trial showed only that County employees were negligent in assigning to Shoyoye a parole hold in the computer system, and in failing to detect the error during the subsequent quality control procedure. None of the County employees here wrongfully detained Shoyoye with actual or presumed knowledge that he should have been released. Early on, someone followed through on his inquiry and ascertained that he had a DCL hold. The employees could reasonably rely on the information in the computer system, based on the reasonable assumption that the quality control check would catch errors. As a result, the County employees thought he should be there. Any intimidation or coercion that occurred was simply that which is reasonable and incident to maintaining a jail. The coercion was not carried out in order to effect a knowing interference with Shoyoye's constitutional rights. This is in stark contrast to *Venegas II*, for example, in which the evidence presented could support a finding that the probable cause that initially existed to justify stopping the plaintiffs eroded at some point, such that the officers' conduct became intentionally coercive and wrongful, i.e., a knowing and blameworthy interference with the plaintiffs' constitutional rights. (*Venegas II, supra,* 32 Cal.4th at p. 843 ["plaintiffs in this case have alleged unconstitutional search and seizure violations extending far beyond ordinary tort claims"].)

Here, County employees certainly were rude to him at times, but they did not threaten or intimidate Shoyoye for voicing his opinion that he should be released. They coerced him to remain incarcerated, but they did not for example coerce him to stop inquiring about his release, threaten him for doing so, or punish him in any way. No one ignored him deliberately, knowing that he should in fact be released, let alone purposefully threaten or intimidate him. At worst they were rude and indifferent to his inquiries. But jail officials do not have a duty to be polite. There is no evidence that Shoyoye was treated differently than other inmates who were lawfully incarcerated, or that any conduct directed at him was for the purpose of interfering with his constitutional rights. He felt physically threatened by other prisoners who thought he might be an informant, not by County officials. No doubt the experience was traumatic and frightening, but there

was no evidence of any coercion independent of that inherent in a wrongful detention itself. We therefore conclude, as a matter of law based on the undisputed facts, that Shoyoye did not establish a violation of section 52.1. We reverse that portion of the judgment finding against the County on the cause of action pursuant to section 52.1. Accordingly, we also reverse the award of attorney fees in favor of Shoyoye that were awarded pursuant to subdivision (h) of section 52.1.[5]

### III. *Reversal of the False Imprisonment Verdict and Associated Damage Award Is Not Required*

The County asserts that if the judgment in favor of Shoyoye under section 52.1 is reversed, we must reverse the entire judgment because the jury did not apportion the damage award between the section 52.1 cause of action and the false imprisonment claim. We conclude under the factual circumstances present here, where the damages attributable to each cause of action are identical, that reversal of the false imprisonment verdict and associated damage award is not required.

■ "The elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." (*Easton v. Sutter Coast Hospital* (2000) 80 Cal.App.4th 485, 496 [95 Cal.Rptr.2d 316].) The evidence presented at trial was clearly sufficient to establish those elements.

Shoyoye did not present evidence at trial of any threats, intimidation, or coercion apart from that which is incident to detention in County jail. Indeed, he vehemently argued that the intimidation and coercion inherent in his wrongful detention were alone sufficient to support his claim. Plaintiff's counsel did not suggest to the jury that they should award damages for each cause of action separately, or award additional damages because of the section 52.1 claim. Under these circumstances, we need not reverse the entire judgment because the measure of damages for false imprisonment, as this case was presented to the jury, was identical to the measure of damages for violation of section 52.1. We do not decide whether an additional award would be warranted to compensate a plaintiff for the more egregious conduct which we have concluded is necessary to establish a violation of section 52.1. But we do find that the verdict here included no such augmentation.

---

[5] This conclusion of course renders moot Shoyoye's cross-appeal regarding the amount of the attorney fee award.

## DISPOSITION

The judgment in favor of Shoyoye as to the section 52.1 cause of action is reversed, as is the award of attorney fees in favor of Shoyoye, which was granted under the authority of that section. The judgment in favor of Shoyoye is affirmed as to the cause of action for false imprisonment, and the associated monetary damage award is affirmed. The parties are to bear their own costs on appeal.

Epstein, P. J., and Manella, J., concurred.

A petition for a rehearing was denied March 13, 2012, and the petition of appellant Adetokunbo Shoyoye for review by the Supreme Court was denied May 9, 2012, S201348. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.