Filed 1/28/14 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BELINDA QUEZADA et al., | B245879 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC464380) |
| v. | ORDER MODIFYING OPINION |
| CITY OF LOS ANGELES et al., | [NO CHANGE IN JUDGMENT] |
| Defendants and Respondents. | |

THE COURT:

It is ordered that the opinion filed herein on January 8, 2014, be modified as follows:

1. On page 2, third sentence of the second full paragraph, the name "Weiland's Bakery" is changed to "Weiland's Brewery."

2. On page 3, line 3, the word "intimated" is changed to "intimidated."

3. On pages 5, 7 through 9, 13, and 14 the name "Randall" is changed to "Randal."

4. On pages 3, 5, 8, and 15 the name "Ornellas" is changed to "Ornelas."

There is no change in the judgment.

CERTIFIED FOR PUBLICATION.

_____
ROTHSCHILD, Acting P. J.          CHANEY, J.          JOHNSON, J.

Filed 1/8/14 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BELINDA QUEZADA et al., | B245879 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC464380) |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge. Affirmed.

Fullerton & Hanna and Lawrence J. Hanna for Plaintiffs and Appellants Belinda Quezada, Abel Cepeida and Enrique Verduzco.

Carmen A. Trutanich, City Attorney, and Paul L. Winnemore, Deputy City Attorney, for Defendants and Respondents City of Los Angeles and Charles Beck, Chief of Police.

————————————

Plaintiffs Belinda Quezada, Abel Cepeida, and Enrique Verduzco appeal summary judgment in their action against the City of Los Angeles (City) and Charles Beck, the Chief of the Los Angeles Police Department. Plaintiffs, police officers with the City's police department, sued the City based upon their treatment during a departmental investigation into the discharge of one of the officer's weapons while the three officers were off duty and had been drinking at a bar near the police station. Plaintiffs asserted claims for civil rights violations under the Bane Act (Civ. Code, § 52.1) and violations of the Public Safety Officers Bill of Rights Act (Gov. Code, §§ 3300–3313) (POBRA). We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Factual Background

#### 1. The Incident

Plaintiffs are police officers employed by the City's police department (the Department). On June 15, 2010, the regular work shift for plaintiffs commenced at 2:30 p.m. and ended at 11:00 p.m. After their shift ended, the plaintiffs parked their personal vehicles at the Hollenbeck Station parking lot and went to Weiland's Bakery, located near the intersection of First Street and Hewitt Street. Quezada had one drink, but Cepeida and Verduzco consumed numerous alcoholic beverages and became intoxicated. The three left the bar shortly before closing at 2:00 a.m. on June 16, 2010.

Quezada was talking on her cell phone and had reached the gate of the Hollenbeck substation's parking lot when she heard gunshots. She stopped abruptly and looked behind her. She turned and saw Cepeida and Verduzco behind her. Believing that they had fired a gun, she disarmed both of them. Central Area officers received a report of "'shots fired'" near First and Hewitt Streets. The witness heard approximately five to six gunshots, and described the suspects as two male Hispanics in white T-shirts.

Several patrol cars responded to the scene. Sergeant Hicks, one of the responding officers, ordered plaintiffs "on-duty" and separated them. Verduzco told officers that he had accidentally fired his gun in his truck, but an officer who looked into Verduzco's

2

truck did not find any evidence of shots fired. Cepeida does not dispute he did not see anyone search his car while he was still on the scene. Although Quezada observed officers looking in her car, she did not feel intimated and did not see them look at any part of her vehicle that was not in plain view. One of the responding officers took Quezada's gun. Quezada, Verduzco and Cepeida were separated. Quezada did not tell the responding officers that she believed either Cepeida or Verduzco had fired a gun.

Detective Daniel Ornellas, who was assigned to the Internal Affairs Group's Criminal Investigations Division, received a call regarding the incident and arrived at the scene around 4:25 a.m. to begin processing the evidence. It took approximately four hours to process the evidence. As Detective Ornellas believed the officers had used their own weapons in the shooting, he needed to search their vehicles to determine whether the weapons were inside the vehicles. When Detective Ornellas looked into Verduzco's truck, he saw a weapon in plain view. He asked plaintiffs if he could search their vehicles, but plaintiffs refused to consent.

### 2. *Interrogation of Plaintiffs*

Plaintiffs were taken to three locations during their interrogation on June 16, 2010: Central Station, Parker Center, and the Bradbury Building.[1] Plaintiffs were released at 9:00 p.m. that evening. At each location, plaintiffs gave a "public safety statement"[2] and were subject to an administrative interrogation.

---

[1] The record does not reflect the precise time plaintiffs were transported between these various locations.

[2] Whenever there is an officer involved shooting, the Department obtains a statement from involved officers and witnesses. This statement is known as a "public safety statement" and the officer has no right to an employee representative or an attorney because the questions are limited to the number and direction of rounds fired, whether other officers fired any rounds, whether a suspect fired rounds at the officers, and if so what direction the suspect fired, whether anyone was injured and their location, whether there are any witnesses and their location, the location of the officers when they fired their weapons, whether there are outstanding suspects at the location, and the location of any weapons or evidence.

3

At Central Station, plaintiffs were separated and were appointed an employee representative. Later, plaintiffs were taken from Central Station to Parker Center for photographs and breathalyzer tests. Finally, plaintiffs' Internal Affairs administrative interviews were conducted at the Bradbury building.

Commander Richard Webb, who is the Commanding Officer of the Department's Internal Affairs Group,[3] was advised that the public safety statements made by Officers Cepeida, Verduzco, and Quezada at the scene did not provide any useful information. Commander Webb was told that Quezada had unloaded Cepeida's or Verduzco's weapons, that an officer had an unloaded weapon on his or her person, and that one or more of the weapons involved in the shooting was in one of the plaintiffs' cars. Either Verduzco or Cepeida told a responding supervisor that he accidentally discharged his weapon in his vehicle although this was not true. None of the witnesses who called 911 could identify which of the plaintiffs was involved in the shooting, the weapons they used or where the weapons were located. Commander Webb determined to obtain search warrants of plaintiffs' vehicles, conduct breathalyzer tests of the officers, photograph them, and to administratively interview them pursuant to the Department's Internal Affairs procedures.

Plaintiffs also could have been charged criminally with violations of Penal Code sections 246.3, 594, subdivision (a), and 647, subdivision (f), as well as potentially false

---

[3] The Professional Standards Bureau oversees the Forces Investigations Division, Special Operations Division, and the Administrative and Criminal Investigation Divisions of Internal Affairs Group. Internal Affairs Group investigates employee behavior that either violates the law or Department policies, procedures or practices. Internal Affairs Group is divided into two divisions, the Administrative Investigation Division and the Criminal Investigation Division. The Administrative Investigation Division investigates complaints of misconduct that are primarily administrative, namely employee behavior that violates Department policies, procedures or practices, while the Criminal Investigation Division investigates complaints that an employee has violated the law. If the employee's misconduct is both administrative and criminal, Internal Affairs Group will conduct a bifurcated investigation with two separate groups of investigators.

and misleading statements made by plaintiffs regarding the incident. Pursuant to the Memorandum of Understanding (MOU) in effect between the Department and the Police Protective League,[4] when an officer is subject to an administrative or criminal investigation, any interview of an employee in connection with an investigation that the employee reasonably believes may result in disciplinary action against the employee entitles the employee to the representative of the employee's choice. Sergeant Rachel Canchola was provided to plaintiffs as their employee representative.

The plaintiffs requested attorney Randall Quan to represent them, and Quan was contacted. However, Internal Affairs Group learned, at 8:00 a.m. on June 16, 2010, that Quan would not be available until late that evening. Commander Webb thus waited a reasonable amount of time, until about 2:30 p.m., to begin interviewing the officers to give them time to find an attorney. According to Randall Quan, at 9:00 a.m. on June 16, 2010, he was contacted by Sergeant Canchola regarding representing plaintiffs, and was advised all three plaintiffs were sleep deprived and that two of them had consumed excessive amounts of alcohol. Quan advised Canchola that he had previously-scheduled interviews and was not available, and that he would represent plaintiffs if Internal Affairs Group could approve rescheduling of Quan's currently scheduled appointments. Quan stated he would be available at 9:00 p.m. Detective Ornellas informed Quan that plaintiffs' interviews would not be rescheduled, and that Internal Affairs Group would not wait for Quan to be available. In Quan's belief, Internal Affairs Group often does not want attorneys present during Internal Affairs Group investigations, and often has no regard for the physical or mental status of accused officers.

Detective Ornellas obtained a search warrant at 1:00 p.m. on June 16, 2010, and searched the plaintiffs' vehicles. In Cepeida's car, he found two weapons and some

---

[4] The Police Protective League is the legally recognized collective bargaining unit regarding the working conditions and benefits of officers at the rank of lieutenant and below.

ammunition that was later determined to match the bullet casings and bullets found at the scene of the shooting.

### 3. Plaintiffs' Individual Experiences While Detained

While being transported around, Quezada admitted that she was not handcuffed at any time, nor was she placed in a holding tank while at Central station. She was given an opportunity to speak with her husband. At Parker Center, when given breathalyzer testing, she was told that if she did not comply with the breathalyzer, she would be charged with insubordination. Quezada did not understand why she had to take a breathalyzer test if she was not driving and had not been acting drunk, but she acknowledged that if the Internal Affairs Group had reasonable cause to believe she was intoxicated, they had a right to insist on a breathalyzer test. Quezada was told that her car would be impounded if she did not consent to a search. When she learned that Verduzco and Cepeida had requested a search warrant, Quezada did so as well. No other threats were made to her.

While on a restroom break, Quezada washed her face. She did not have a toothbrush and complained about that, but did not ask if she could get a toothbrush or fresh clothes. She recalled at some point that she went to Subway for a sandwich. Every time she asked for a break she was given one. She was denied food and sleep, but other than that, Quezada did not contend she was subjected to unhealthful conditions. She was not threatened with violence.

Quezada was reassigned to desk duty, and believed her reassignment to desk duty was punishment. Quezada, who maintained she was a witness, not a suspect, did not understand that if she were only a witness why she was being treated like a suspect, although she acknowledged there was an allegation of misconduct against her based upon her failure to report the other officers' misconduct. Captain Hanczuk, the commanding officer of the Hollenbeck Division, had the authority to change Quezada's assignment while the investigation was pending.

6

Cepeida was not handcuffed when placed in the patrol vehicle. After the incident, he still felt sick, nauseated and dehydrated. Cepeida threw up in the bathroom. He had a hangover, but he did not remember asking to see a doctor or requesting medical treatment. He had not slept for many hours. Cepeida did not get food or water, although at Central Station he did not ask for any. Although there were vending machines at Central Station with food and water, he did not make an attempt to use them. Nobody told him he could not leave the conference room. At another time, he was offered food and water, but he was not hungry.

Cepeida attempted to make a phone call, but was unable to complete the call. When he got to Central Station, he was told he would be able to make a call, but nothing happened. At Central Station, the room was cold and dirty, but "Central Station is kind of dirty. So it should have been normal." He did not ask for a change of clothes. He admitted that no one threatened him with violence.

Cepeida felt coerced into having a breathalyzer test because he knew it was administratively possible for the department to ask for a breathalyzer. He wanted to have an attorney present so he did not waive his *Miranda*[5] rights and insisted on having an attorney present. Cepeida specifically asked for Randall Quan. Canchola told him he would not be able to eat until his interview was concluded. When he was told Quan was not available that day, he asked for another attorney but was told that Internal Affairs Group would interview him whether or not there was an attorney present. Cepeida did not attempt to find another attorney when he was told Randall Quan was not available, and he did not have time to find another attorney because Internal Affairs Group told him they were going to proceed.

Verduzco did not believe there was anything in plain view in his truck, but he believed Cepeida's gun was in his truck. When the police put him in a car, he was not handcuffed. He was not handcuffed at any time at the Bradbury Building.

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

7

Although he had a headache and was nauseated, Verduzco did not ask for medical assistance. He did not use the restroom because he thought he would have to leave the door open. He did not ask for a change of clothes. It took an hour and a half to get a bottle of water when he asked for it. While on the way to the Bradbury Building, he asked to stop at a liquor store where he bought an energy drink. He was also able to get a sandwich and a drink at Subway. Verduzco was still feeling intoxicated when he had his Internal Affairs interview. He did not find the rooms he was in to be cold, nor was he disturbed that he was not allowed to change clothes.

While at the scene, Detective Ornellas asked for permission to search Verduzco's car. Detective Ornellas told Verduzco that if they had to get a search warrant, his car would be impounded and Verduzco would have to pay impound fees. This was the only threat made to Verduzco.

Sergeant Canchola told him she would try to get him an attorney, and Verduzco asked for Randy Quan because he had used him before. When Verduzco learned that Randall Quan would not be available until seven or eight o'clock that evening, he asked Canchola if there was another attorney. Canchola told him she would try to get him one. He does not know whether she called any panel attorneys. Verduzco was advised of his *Miranda* and *Lybarger*[6] rights and warnings. No criminal charges were ever filed against Verduzco.

All plaintiffs admitted that Internal Affairs had the right to take their breathalyzer tests.

---

[6] *Lybarger v. City of Los Angeles* (1985) 40 Cal.3d 822 held that although police officers subject to an administrative inquiry into possible criminal misconduct must be advised of their *Miranda* rights, they also must be advised that silence during such an inquiry "could be deemed insubordination, leading to administrative discipline," and any statement made under the compulsion of a threat of discipline could not be used in a criminal proceeding. (*Lybarger*, at p. 829.)

### 4. No Interviews Regarding Criminal Conduct

Detective Ornellas, who was conducting the criminal investigation into plaintiffs' conduct, did not interview plaintiffs concerning a possible criminal investigation because plaintiffs had refused to waive their *Miranda* rights.

## B. Procedural History

### 1. Plaintiffs' Complaint

Plaintiffs' complaint filed June 30, 2011 stated claims for violations of the Bane Act (Civ. Code, § 52.1), violations of POBRA (Gov. Code, § 3300 et seq.) and violations of Title 42 United States Code section 1983. Plaintiffs dismissed their federal civil rights claims under Title 42 United States Code section 1983.

### 2. Defendants' Motion for Summary Judgment

On July 27, 2012, defendants moved for summary judgment, or in the alternative, summary adjudication, arguing that no POBRA violations occurred because plaintiffs were ordered on duty, given overtime pay, allowed to eat, drink, use the restroom as need, and make phone calls. The police department read plaintiffs their *Miranda* rights; plaintiffs had an employee representative with them at all phases of the investigation; and the department is permitted to change an officer's duties while an investigation is ongoing. The seriousness of the incident, which involved charges of criminal and administrative misconduct, required the police department to conduct the investigation immediately. It took police four hours to process the crime scene. Further, the police department did not violate the Bane Act because plaintiffs were not threatened with violence, the searches of plaintiffs' vehicles were not unlawful, and plaintiffs' right to an attorney was not violated because plaintiffs refused to waive their *Miranda* rights and POBRA does not guarantee an officer an attorney in an administrative investigation.

Plaintiffs opposed, arguing that the undisputed facts established they had gone 30 hours without sleep when their interviews were conducted; they were given little food or water; the 911 calls established that Quezada was not involved in the shooting and was not intoxicated; plaintiffs did not consent to the searches of their vehicles; they were

intimidated by the search warrants; and their chosen counsel, Randall Quan, was not available. They argue these undisputed facts add up to a violation of their POBRA rights and the Bane Act and summary judgment was improper. Plaintiffs submitted the Declaration of Roy Artal, M.D. in which he stated that sleep deprivation results in significant changes in cognitive functioning, headaches, and detrimental effects on mental and physical health. Given that the plaintiffs had been deprived of sleep for 30 hours, in Dr. Artal's opinion this would have affected their ability to accurately recall and relate the events of June 16, 2010. Four hours after the incident, Cepeida had a blood alcohol level of .12 to .13 and Verduzco had a blood alcohol level of .09 to .10.

The trial court granted defendants' summary judgment motion and entered judgment for the City and Chief Beck. At the hearing, the court stated that it found plaintiffs' evidence in opposition to the motion to be "irrelevant, off the point, [and] nonresponsive." The court stated, "[I]t's very misleading to describe this as a situation where the plaintiffs were kept up for 30 hours when, in fact, what happened was they did their regular work shift, were spry enough to go out drinking, and then after this incident happened, were kept, appropriately in my view, separated subject to an investigation." In conclusion the court found that "to the extent [it] could even find any facts to support [plaintiffs'] arguments, [it] didn't find them to be persuasive or sufficient to create a material issue of fact."

## DISCUSSION

### I. Standard of Review

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850.) "Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to that cause of action." (Code Civ. Proc., § 437c, subd. (p)(1); *Aguilar*, at p. 850.) A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the

10

party opposing the motion in accordance with the applicable standard of proof."
(*Aguilar*, at p. 850.)  Where summary judgment has been granted, we review the trial
court's decision de novo, "considering all of the evidence the parties offered in
connection with the motion (except that which the trial court properly excluded) and the
uncontradicted inferences the evidence reasonably supports."  (*Merrill v. Navegar, Inc.*
(2001) 26 Cal.4th 465, 476.)

## II.     Pobra Claims

POBRA explicitly declares that its purpose is to promote "effective law
enforcement" by maintaining "stable employer-employee relations" in law enforcement
agencies.  (Gov. Code, § 3301)  POBRA, initially enacted in 1976 (Stats. 1976, ch. 465,
§ 1, p. 1202), sets forth a list of "basic rights and protections which must be afforded all
peace officers by the public entities which employ them," and is a catalog of "the
minimum rights (Gov. Code, § 3310) the Legislature deems necessary to secure stable
employer-employee relations."  (*Baggett v. Gates* (1982) 32 Cal.3d 128, 135.)  "The
various procedural protections provided by POBRA 'balance the public interest in
maintaining the efficiency and integrity of the police force with the police officer's
interest in receiving fair treatment.'  [Citation.]"  (*Mays v. City of Los Angeles* (2008) 43
Cal.4th 313, 320.)  These rights include limits on and guidelines for investigations and
interrogations of public safety officers in connection with disciplinary proceedings (Gov.
Code, § 3303), the right to an administrative appeal and a one-year statute of limitations
for investigations (Gov. Code, § 3304), the right to notification of adverse comments
placed in his or her personnel file and the right to comment thereon (Gov. Code,
§§ 3305–3306), the right to inspection of personnel files (§ 3306.5), the right to refuse to
submit to a lie detector test (Gov. Code, § 3307), and the right to the protections of
POBRA (Gov. Code, § 3309.5, subd. (a)).

### A.     *Reasonable Time for Interrogation*

Plaintiffs contend their interrogation sessions violated their POBRA rights because
the interviews were conducted after they had been awake for a long time, Verduzco and

11

Cepeida were intoxicated and/or hung over, and there were no exigent circumstances, which was in violation of POBRA's directive that "[t]he interrogation be conducted at a reasonable hour" and "at a time when the public safety officer is on duty, or during normal waking hours" unless the "seriousness of the investigation requires otherwise." (Gov. Code, § 3303, subd. (a).)

Under Government Code section 3303, subdivision (a) the interrogation must "be conducted at a reasonable hour, preferably at a time when the public safety officer is on duty, or during the normal waking hours for the public safety officer, unless the seriousness of the investigation requires otherwise." This section does not require that the interrogation be conducted at the convenience of the officer or the officer's chosen representative. Rather, POBRA permits that "the seriousness of the investigation may allow interrogation at an unreasonable off-duty time." (*Upland Police Officers Assn. v. City of Upland* (2003) 111 Cal.App.4th 1294, 1303 (*Upland Police Officers Assn.*).)

Under *Upland Police Officers Assn.*, *supra*, 111 Cal.App.4th 1294, plaintiffs were not entitled to wait for Quan to become available. The seriousness of the circumstances prompting the investigation—the drunken random firing of shots by off-duty officers—mandated that Internal Affairs conduct its investigation at the earliest opportunity while plaintiffs' memories (although hampered by excessive alcohol consumption) were freshest. The fact that plaintiffs had been awake for many hours before being interrogated was the result of the incident occurring after they had been on duty for many hours, and was not the result of the Department's unreasonable actions.

### B. *Physical and Mental Conditions of Interrogations*

Plaintiffs also contend that during their interrogations they were subjected to physical and mental hardships during the investigation, including having to watch their personal vehicles being searched without their consent; were housed in uncomfortable rooms that were too cold or too hot during interrogations; were denied their right to eat when they needed to and were limited in the amount of water they had access to; were

12

not allowed to obtain a change of clothing or take a shower; and were restricted in their use of toilet facilities.

Government Code section 3303, subdivision (d) provides that "[t]he interrogating session shall be for a reasonable period taking into consideration gravity and complexity of the issue being investigated. The person under interrogation shall be allowed to attend to his or her own personal physical necessities." The record here indicates that although during the interrogation process from 2:30 a.m. to 9:00 p.m. at times the plaintiffs were denied access to food or water, the deprivation was not unreasonable given that plaintiffs did have access to food, water and restrooms during the interrogation process. Plaintiffs did not ask for medical attention. Finally, plaintiffs have offered no evidence that they suffered any adverse mental or physical health consequences as a result of the interrogations.

### C.    *Provision of Public Safety Statements*

Plaintiffs contend they were forced to provide public safety statements on at least three occasions while detained over an extended period of time, and the purpose of such interrogations was not to obtain information by an actual need to protect public safety, but for the purpose of improperly eliciting incriminating information from them. In particular, the last of the public safety statements was elicited 12 hours after the police had finished their on-scene investigation and after plaintiffs had requested numerous times to have Randall Quan present to represent them and at a time when there were no exigent circumstances compelling further interrogation.

As discussed above, the seriousness of the circumstances mandated that the investigating officers conduct their inquiry with haste. Further, the public safety statements plaintiffs gave at the scene were insufficient, and two of the plaintiffs were physically impaired due to their self-inflicted excessive alcohol consumption. Finally, other than the firing of the weapon and Quezada's failure to accurately report her knowledge of the incident, plaintiffs point to no incriminating evidence elicited from them during the day-long interrogations.

13

### D.    *Right to Counsel*

Plaintiffs contend that because they were subject to both an administrative and a criminal investigation, under *Miranda* and POBRA, they had a right to have counsel present during interrogations.  During the early morning detention of June 16, 2010, Sergeant Rachel Canchola represented them as their employee representative, but representatives like Sergeant Canchola are not trained in criminal law matters and do not have a communication privilege with officers under investigation.  Although attorney Randall Quan was contacted to represent plaintiffs, due to scheduling conflicts he was not immediately available and was told that no accommodation would be made for his absence and that plaintiffs' interviews would proceed without legal counsel.

Government Code section 3303, subdivision (i) provides:  "Upon the filing of a formal written statement of charges, or whenever an interrogation focuses on matters that are likely to result in punitive action against any public safety officer, that officer, at his or her request, shall have the right to be represented by a representative of his or her choice who may be present at all times during the interrogation.  The representative shall not be a person subject to the same investigation.  The representative shall not be required to disclose, nor be subject to any punitive action for refusing to disclose, any information received from the officer under investigation for noncriminal matters."

However, an officer's right to be represented by the person of his or her choice is not unlimited.  "The officer must choose a representative who is reasonably available to represent the officer, and who is physically able to represent the officer at the reasonably scheduled interrogation.  But it is the officer's responsibility to secure the attendance of his or her chosen representative at the interrogation.  If he or she is unable to do so, the officer should select another representative so that the interrogation may proceed 'at a reasonable hour.'  ([Gov. Code,] § 3303, subd. (a).)"  (*Upland Police Officers Assn.*, *supra*, 111 Cal.App.4th at p. 1306.)  The chosen representative during administrative hearings need not be an attorney.  (*Id.* at p. 1306, fn. 7.)

14

Here, as discussed above, under *Upland Police Officers Assn.*, *supra*, 111 Cal.App.4th 1294, plaintiffs were not entitled to wait for Quan to become available. The seriousness of the circumstances prompting the investigation mandated that Internal Affairs conduct its investigation at the earliest opportunity while plaintiffs' memories were freshest. Further, even when confronted with Quan's unavailability, the record discloses that plaintiffs made little or no effort to obtain alternative counsel to represent them so that the interrogations could proceed.

### III. Search of Plaintiff's Vehicles

Plaintiffs contend that when Sergeant Hicks searched Verduzco's personal vehicle, he lacked consent or a search warrant but ostensibly relied on Verduzco's statement that a weapon was in plain view that might have been used in the incident, yet Verduzco denied making this statement, creating a triable issue of fact.

Under the Fourth Amendment, the law is clear that any incriminating evidence observed in plain view may be seized. (See *Coolidge v. New Hampshire* (1971) 403 U.S. 443, 465 [91 S.Ct. 2022, 29 L.Ed.2d 564]; see also *Horton v. California* (1990) 496 U.S. 128, 137 [110 S.Ct. 2301, 110 L.Ed.2d 112].) The United States Supreme Court has said, "The plain-view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity. [Citation.] The plain-view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy." (*Illinois v. Andreas* (1983) 463 U.S. 765, 771 [103 S.Ct. 3319, 77 L.Ed.2d 1003].)

Here, before the procurement of search warrants (the validity of which the plaintiffs do not contest), the investigating officers did not act improperly with respect to plaintiffs' vehicles. The gun in Verduzco's car was undisputedly in Detective Ornellas's plain view. Quezada saw police look in her car, but admitted they did not look at any part of her car that was not in plain view. Finally, Cepeida admitted that he did not see

15

the investigating police look in his car.  Indeed, evidence from Cepeida's car was not recovered until the search warrants had been obtained.  Thus, plaintiffs' Fourth Amendment rights were not violated.

## IV.    Bane Act

Plaintiffs contend the trial court erred in reading a requirement of "threats of violence or actual violence" into Civil Code section 52.1 because the Bane Act only requires threats, intimidation or coercion; further, because they were subjected to coercion in their interrogations, triable issues of fact exist on their Bane Act claims.

In 1987 the Legislature enacted a measure entitled the Tom Bane Civil Rights Act.  (Stats. 1987, ch. 1277, § 1, p. 4544.)  One of its provisions, codified as Civil Code section 52.1, authorizes a private cause of action for damages and equitable relief against any person who, "whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state . . . ."  (Civ. Code, § 52.1, subd. (a).)  "Speech alone is not sufficient to support an action . . . except upon a showing that the speech itself threatens violence against a specific person or group of persons" who have a reasonable fear of violence because "the person threatening violence had the apparent ability to carry out the threat." (*Id*., subd. (j).)

However, the statutory language does not limit its application to hate crimes.  Notably, the statute does not require a plaintiff to allege the defendant acted with discriminatory animus or intent based upon the plaintiff's membership in a protected class of persons.  (*Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 841–843.)  A defendant is liable if he or she interfered with or attempted to interfere with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion.  (*Id*. at p. 843.)  The coercion inherent in detention is insufficient to show a Bane Act violation.  (*Shoyoye v. County of Los Angeles* (2012) 203 Cal.App.4th 947, 959–960.)

Here, plaintiffs' Bane Act violations are premised upon alleged violations of POBRA and the allegedly unlawful search of their vehicles. As discussed above, plaintiffs have failed to establish their interrogations violated their rights under POBRA or that the officers lacked probable cause. Further, plaintiffs have failed to show that there were any undue threats or coercion. Plaintiffs' evidence on this point establishes that at most they felt compelled to submit to a breathalyzer test or suffer adverse employment consequences, and Verduzco was told his car could be impounded if he did not consent to a search. This compulsion does not rise to the level of a Bane Act violation for the simple reason that a police officer's continued employment can be premised on submission to a breathalyzer test and cars subject to search warrants may be lawfully impounded. (*People v. Williams* (2006) 145 Cal.App.4th 756, 761.) "As part of their '"community caretaking functions,"' police officers may constitutionally impound vehicles that 'jeopardize . . . public safety and the efficient movement of vehicular traffic.' [Citation.] Whether 'impoundment is warranted under this community caretaking doctrine depends on the location of the vehicle and the police officers' duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft.' [Citation.]" (*Ibid.*)

## V.     Quezada Was Not Merely a Witness

Plaintiffs contend that Quezada was not involved in the incident and merely was a potential witness: eyewitnesses identified only two male suspects; surveillance video did not show Quezada at the scene—yet Quezada was treated as if she had participated in the melee.

Government Code section 3303, subdivision (j) provides that, "No public safety officer shall be loaned or temporarily reassigned to a location or duty assignment if a sworn member of his or her department would not normally be sent to that location or would not normally be given that duty assignment under similar circumstances." However, Quezada was not merely a witness because Quezada was not completely forthcoming with the investigating officers at the scene—she failed to tell them she

17

believed either Verduzco or Cepeida had fired his weapon.  Thus, Captain Hanczuk was well within his authority to change her assignment while the investigation was pending.

## DISPOSITION

The judgment is affirmed.  The parties are to bear their own costs on appeal.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


We concur:


ROTHSCHILD, Acting P. J.


CHANEY, J.


18